**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| In Re: | Case No.: 26-30438 |
| Jade Presents, LLC, | Chapter 11 – Subchapter V |
| Debtor, Jointly Administered. | |
| In Re: | Case No.: 26-30439 |
| Tickets 300, LLC, | Chapter 11 – Subchapter V |
| Debtor, Jointly Administered. | |

**EXHIBITS TO MOTION FOR RELIEF FROM AUTOMATIC STAY**

**EXHIBIT A**

**Contract for Deed and Amendments**



# CONTRACT FOR DEED

THIS CONTRACT FOR DEED (this "*Agreement*"), made and entered into this ___ day of June, 2024, by and between DFI AU LLC, a North Dakota limited liability company ("*Seller*"), with an address of 210 Broadway N, Suite 300, Fargo, North Dakota 58102, and Jade Nielsen Properties, LLC, a North Dakota limited liability company ("*Buyer*"), with an address of 302 N University Drive, Fargo, North Dakota, 58102.

## WITNESSETH:

WHEREAS, Seller is the fee simple owner of that certain parcel of real property located in Cass County, North Dakota, legally described as:

**Lot One, in Block One, of the Corrected Plat of The Edge Addition to the City of Fargo, situate in the County of Cass and the State of North Dakota.**

commonly known as the "Goering Land", with an address of 1329 5ᵗʰ Ave N, Fargo, North Dakota 58102, together with any appurtenances attached thereto (the "*Property*");

WHEREAS, Seller desires to sell and transfer, and Buyer desires to purchase, the Property for the price and on the terms, provisions and conditions as hereinafter set forth.

NOW, THEREFORE, in consideration of the terms, provisions and conditions as contained herein, the Buyer and Seller hereby agrees as follows:

1.  CONVEYANCE. If Buyer shall first make the payments and perform the covenants hereinafter mentioned on its part to be made and performed, Seller hereby covenants and agrees to sell, convey, transfer and assure at the Final Closing (defined below), the Property to Buyer, in fee simple by good and sufficient Warranty Deed, subject to Permitted Encumbrances (defined hereafter) as of the Initial Closing (defined below) and subject to all liens, mortgages, claims, liabilities, or encumbrances placed on the Property after the Initial Closing unless such lien, mortgage, claim, liability, or other encumbrance was placed on the Property after the Initial Closing by the acts of Seller without Buyer's consent.

2.  PAYMENTS.

a.  PURCHASE PRICE PAYMENT. In consideration of the sale of Property by Seller, Buyer shall pay to Seller the sum of Seven Hundred Eighty Thousand and No/100 Dollars ($780,000.00) and other good and valuable consideration, the sufficiency of which is hereby agreed and acknowledged (the "*Purchase Price*"). The Purchase Price shall be paid from Buyer to Seller as follows:

(i)  One Hundred Sixty Thousand Dollars and no/100 Cents ($160,000) shall be paid to Seller in cash or other immediately available funds on or before the Initial Closing ("*Initial Payment*") subject to prorations provided herein; and

(ii)    Payment of the remaining principal balance of the Purchase Price in the amount of Six Hundred Twenty Thousand Dollars and no/100 ($620,000.00) (the "**Contract Balance**"), shall be made as follows:

(a)    Buyer to assume responsibility for all financial obligations related to the ownership of the property, including but not limited to, all mortgage payments, property taxes/special assessments, property insurance etc and

(b)    A final balloon payment of any and all outstanding principal and accrued interest remaining on the Seller's note at any time Buyer is ready, wiling and able to close, but that timing shall not exceed six (6) months from the effective date of this agreement, as well as all other amounts or indebtedness remaining due from Buyer under this Agreement, shall all be paid in cash or other immediately available funds on or before the Final Closing (collectively, the "***Balloon Payment***").

Monthly installment payments to the seller shall include reimbursement for property insurance premiums maintained by the seller and payments of interest only on a $622,500 promissory note with an interest rate of 7.50%. Interest shall be calculated on a basis of a 360-day year. Any partial months will be prorated based on the number of days the Contract for Deed is outstanding.

3.    Buyer may prepay all or any portion of the Contract Balance at any time without penalty, provided, any partial prepayment shall not reduce the Monthly Installments due hereunder, and instead any partial prepayments shall be applied first to the balance of the Balloon Payment, and, if the Balloon Payment is prepaid in full, any partial prepayment thereafter shall applied be towards Monthly Installments in the reverse of the order in which they are set to come due under the attached amortization schedule. TITLE WORK.

a.    TITLE WORK AT INITIAL CLOSING.

(i)    *Initial Title Insurance.* Promptly following the date of this Agreement, Seller shall provide Buyer with a title commitment for a vendee's policy of title insurance covering the Property and providing the terms and conditions upon which the Title Company is willing to insure the ownership interests of Buyer, including all exceptions to such policy (the "***Initial Title Work***"), which such Initial Title Work shall be attached hereto as **Exhibit A** and incorporated herein by this reference. Seller shall pay the cost of generating the Initial Title Work, provided that Buyer shall be responsible for the premium for any policy of title insurance issued based on the Initial Title Work.

(ii)    *Review of Initial Title Work.* Buyer shall be allowed ten (10) days after receipt of the Initial Title Work ("***Title Exam Period***") to examine the Initial Title Work and make any objections thereto in Buyer's sole and absolute discretion (the "***Initial Title Objections***"), any matter set forth in the Initial Title Work and not objected to by Buyer (in writing delivered to Seller within the Title Exam Period)

shall be deemed waived and become a Permitted Encumbrance hereunder. If such Initial Title Objections are made by Buyer, Seller shall be allowed ten (10) days to insure over or to remove such Initial Title Objections (through reasonable and customary means) if Seller elects to do so, provided, however, Seller shall have no obligation to remove, satisfy or correct any Initial Title Objections whatsoever.

(iii)     *Correction of Initial Title Objections.* In the event Seller fails to, or elects not to, satisfy or correct any such Initial Title Objections of which Seller is so notified during the Title Exam Period, then Buyer shall, by written notice to Seller, elect one of the following prior to or at Initial Closing, as Buyer's sole and exclusive remedy: (1) to waive such Initial Title Objections and to complete the Initial Closing in accordance with the terms of this Agreement; or (2) to terminate this Agreement and in such event the parties hereto shall have no further rights, duties or obligations under this Agreement except the other obligations hereunder that are expressly stated to survive termination. If Buyer chooses to complete Initial Closing while any liens, mortgages, claims, liabilities, or other encumbrances (including any unresolved Initial Title Objections) remain on the Property, then such liens, mortgages, claims, liabilities, and other encumbrances (including any unresolved Initial Title Objections) remaining on the Property shall become Permitted Encumbrances and Buyer shall have no further right to object to the same at any time thereafter.

b.     TITLE WORK AT FINAL CLOSING.

*(i)     Title Insurance.* Prior to Final Closing, Buyer may order from the Title Company, a current commitment, updated from the Initial Title Work (the "***Title Commitment***") for an ALTA owner's policy of title insurance, insuring the interests of Buyer as owner upon Final Closing subject to Permitted Encumbrances and any liens, mortgages, claims, liabilities, or encumbrances placed on the Property after the Initial Closing unless such lien, mortgage, claim, liability, or other encumbrance was placed on the Property after the Initial Closing by, or due to the, acts of Seller without Buyer's consent. The cost of the Title Commitment and the premium for Buyer's owner's title policy shall be paid by Buyer at the Final Closing.

(ii)     *Review of Title Commitment.* Buyer shall be allowed fourteen (14) days after receipt of the Title Commitment to examine the Title Commitment and make any objections thereto in Buyer's reasonable discretion (the "***Title Commitment Objections***"), provided Title Commitment Objections may only be made by Buyer with respect to any lien, mortgage, claim, liability, or other encumbrance (other than Permitted Encumbrances) placed on the Property after the Initial Closing by the acts of Seller without Buyer's consent.  If any such Title Commitment Objections are validly made by Buyer, Seller shall be allowed 30 days to insure over or to remove such Title Commitment Objections.

(iii)   *Correction of Title Commitment Objections.*  In the event Seller fails to satisfy or correct any such Title Commitment Objections of which Seller is so notified prior to the Final Closing, then Buyer shall, by written notice to Seller, elect one of the following prior to or at Final Closing: (1) to waive such Title Commitment Objections and to complete the transaction in accordance with the terms of this Agreement; (2) to reschedule Final Closing until such date that such Title Commitment Objections may be adequately corrected in Buyer's reasonable discretion; or (3) seek specific performance of this Agreement.  If Buyer chooses to complete Final Closing while liens, mortgages, claims, liabilities, or other encumbrances (including any unresolved Title Commitment Objections) remain on the Property, then such liens, mortgages, claims, liabilities, and other encumbrances (including any unresolved Title Commitment Objections) remaining on the Property shall become Permitted Encumbrances and Buyer shall have no further right to object to the same at any time thereafter.

c.   PERMITTED ENCUMBRANCES. As used in this Agreement, "*Permitted Encumbrances*" shall mean and include all of the following:

(i)   real estate taxes and installments of special assessments not yet due and payable;

(ii)   zoning, land use, building and similar ordinances;

(iii)   reservations of mineral rights of record;

(iv)   easements, covenants and restrictions of record;

(v)   the Mortgage Documents (provided, the Mortgage Documents shall be released at or prior Final Closing in accordance with Section 3(**Error! Reference source not found.**) below);

(vi)   any matters set forth in the Initial Title Work and/or Title Commitment and not timely objected to by Buyer, any Initial Title Objections and/or Title Commitment Objections waived (or deemed waived) by Buyer, and/or any other matters that become Permitted Encumbrances hereunder, in any case, in accordance with and as provided in Sections 3(a) and 3(b), as applicable; and

(vii)   any liens, mortgages, claims, leases, liabilities, easements, covenants, restrictions or other encumbrances or matters granted, attaching, caused or permitted on or against the Property after the Initial Closing (unless such lien, mortgage, claim, liability, or other encumbrance was placed on the Property after the Initial Closing by the acts of Seller without Buyer's consent).

At the Initial Closing, Seller, Buyer and Lender shall each execute and deliver an agreement (herein, the "**Lender Agreement**") pertaining to the Loan and Mortgage Documents, on terms mutually

agreeable to each of Seller, Buyer and Lender, providing Lender's consent to this Agreement and including such other terms and conditions as may be mutually agreed by Seller, Buyer, and Lender. The Lender Agreement being entered into among Seller, Buyer and Lender, is a condition precedent to the obligations of each of Seller and Buyer to proceed with Initial Closing under this Agreement.

    4.    CLOSING.

    a.    INITIAL CLOSING. Buyer and Seller agree to use best efforts to complete those certain portions of the transactions contemplated under this Agreement enumerated in 4(b) of this Agreement, upon completion of the conditions precedent as set forth in 4(e), 4(f) and 4(g) below, but in any case not later than July 1, 2024, or at such other time as may be mutually agreed to by the parties ("*Initial Closing*"). Initial Closing shall be held at the Title Company or such other location as the parties agree as mutually acceptable.

    b.    OBLIGATIONS AT INITIAL CLOSING. At Initial Closing, Buyer and Seller shall cause the following deliveries to be made:

    (i)    Buyer and Seller shall execute and deliver to the Title Company an executed Memorandum of Contract for Deed, in substantially the same form as Exhibit C, attached hereto and incorporated herein by this reference, so that notice of this Agreement may be recorded;

    (ii)    Buyer shall deliver to the Title Company any fee for recording the Memorandum of Contract for Deed;

    (iii)    Buyer shall deliver to Seller the Initial Payment by wire transfer of immediately available funds; and

    (iv)    Any other documents as required to effectuate the Initial Closing as may reasonably be requested by Seller, Buyer or the Title Company, or as may be required pursuant to this Agreement; and

Upon completion of Initial Closing, the Title Company shall cause the Memorandum of Contract for Deed, in substantially the same form as set forth in **Exhibit B**, attached hereto and incorporated herein by this reference, to be recorded with the Cass County Recorder.

    c.    FINAL CLOSING. Buyer and Seller shall complete those certain portions of the transactions contemplated under this Agreement enumerated in Section 4(c) of this Agreement ("*Final Closing*"), on or prior to December 4, 2024. Final Closing shall be held at The Title Company, 35 4th Street N, Suite 102, Fargo, North Dakota (the "*Title Company*").

    d.    OBLIGATIONS AT FINAL CLOSING. At Final Closing, Buyer and Seller shall cause the following deliveries to be made:

    (i)    Buyer shall deliver to the Title Company the final payment necessary to complete all payment obligations pursuant to this Agreement, including without

limitation, the payment in full of the entire Contract Balance, and other amounts due to Seller hereunder, all by wire transfer of immediately available funds, all of which shall be delivered by the Title Company to Seller upon Final Closing.

(ii)     Buyer shall deliver to the Title Company the fee for recording the Warranty Deed;

(iii)    Seller shall execute and deliver a Warranty Deed conveying the Property to Buyer, subject to the Permitted Encumbrances;

(iv)    Any closing costs of the Title Company shall be split equally between Buyer and Seller;

(v)     Buyer shall have paid (or shall deliver to the Title Company for payment at Final Closing) all outstanding real estate taxes and installments of special assessments due and payable (and required to be paid in order to record the Warranty Deed); and

(vi)    Any other documents as required to effectuate the transfer of the Property as may reasonably be requested by Seller, Buyer, or the Title Company, or as may be required pursuant to this Agreement.

e.     CONDITIONS TO BUYER'S OBLIGATIONS AT INITIAL AND FINAL CLOSING.   The obligation of Buyer to proceed with the Initial Closing and Final Closing shall be subject to the satisfaction, on or before each closing, of all of the following conditions: (i) Seller shall have performed all material obligations applicable to Seller and complied with all material covenants and conditions precedent prior to or as of such closing date; (ii) Seller shall have delivered all documents required to be delivered at the applicable closing; (iii) no suit, action or other proceeding shall be pending or threatened by or before any court or governmental agency in which it is sought to restrain or prohibit the consummation of the transaction contemplated by this Agreement.

f.     [reserved]

g.     CONDITIONS TO SELLER'S OBLIGATIONS AT INITIAL AND FINAL CLOSING.   The obligations of Seller to proceed with the Initial Closing and Final Closing shall be subject (at its discretion) to the satisfaction, on or before such closing, of all of the following conditions: (i) Buyer shall have performed all material obligations and complied with all material covenants and conditions prior to or as of the such closing date; (ii) Buyer shall have delivered all documents and all payments and funds required to be delivered at such closing; (iii) no suit, action or other proceeding shall be pending or threatened by or before any court or governmental agency in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transaction contemplated by this Agreement; and (iv) any and all other conditions and/or contingencies set forth or referred to in this Agreement must also be satisfied or waived on or before the applicable closing.

h.　TERMINATION OF AGREEMENT.  This Agreement and the transactions contemplated herein may be terminated at or prior to the Initial Closing as follows:

(i)　By mutual written consent of all parties.

(ii)　By Buyer pursuant to a written notice delivered at or prior to the Initial Closing if any condition in favor of Buyer contained in this Agreement has not been satisfied or has failed as of or prior to the Initial Closing, or if Seller has failed in any material respect to perform any obligations to be performed by Seller at or prior the Initial Closing.

(iii)　By Seller pursuant to a written notice delivered at or prior to the Initial Closing if any condition in favor of Seller has not been satisfied or has failed as of or prior to the Initial Closing, or if Buyer has failed in any material respect to perform any obligations to be performed by Buyer at or prior the Initial Closing.

(iv)　By either party in the event that Initial Closing has not occurred as provided herein by July 1, 2024.

5.　**REPRESENTATIONS AND WARRANTIES**.  Seller represents, warrants and covenants to Buyer as follows, solely as of the date of this Agreement (except as otherwise expressly stated herein):

a.　TITLE TO PROPERTY.  Seller will hold as of both the Initial Closing and Final Closing, good and marketable fee simple title to the Property, free and clear of all liens, mortgages, encumbrances, security interests, pledges, restrictions, covenants, easements or other interest or obligations of whatever kind and nature, except for the Permitted Encumbrances and all matters revealed or shown by the Initial Title Work.

b.　LITIGATION, ADVERSE CLAIMS AND RELATED MATTERS.  There is no pending litigation, proceeding, or investigation relating to the Property (or, to Seller's knowledge, threatened), nor is Seller subject to any existing judgment, order or decree, that would, in any such case, prevent, impede, or make illegal the consummation of the transactions contemplated in this Agreement.

c.　BINDING OBLIGATION.  This Agreement constitutes the legal, valid and binding obligation of Seller in accordance with the terms hereof.  Seller has all requisite power and authority, to execute, perform, carry out the provisions of and consummate the transactions contemplated in this Agreement.

d.　CONSENTS/APPROVALS.  No consent or approval of any person, entity or governmental agency or authority is required with respect to the execution, delivery and performance of this Agreement by Seller, except the consent of Lender to be obtained pursuant to the Lender Agreement.

6.      **REAL PROPERTY TAXES & ASSESSMENTS.**  Seller shall be responsible for and shall pay all real estate taxes and installments of special assessments of record which were assessed for 2023, payable in 2024 and any unpaid taxes from prior years.  Real estate taxes and installments of special assessments for 2024 (payable in 2025) shall be prorated between the parties to the date of Initial Closing, and shall be collected from the parties by the Title Company out of the proceeds at the Initial Closing and paid by the Title Company to the taxing authority.

7.      **UTILITIES AND SERVICES.**  Buyer shall pay for all utilities, services, and associated taxes relating to the Property from and after the Initial Closing, including, but not limited to, heating, air conditioning, electricity, gas, water, sewer, telephone, internet, and trash.  Such costs and expenses for the month of the Initial Closing shall be prorated to the date of Initial Closing.

8.      **INSURANCE.**  From and after Initial Closing, Buyer agrees to keep all buildings, improvements, and fixtures located on the Property insured against loss by fire, casualty and such other perils as are included in a standard "all-risk" or "special" endorsement, for at least the replacement value of the Property in a company or companies satisfactory to Seller, with loss payable as the interests of the parties shall appear, including a loss payable clause in favor of Seller which provides that Seller's right to recover under the insurance shall not be impaired by any acts or omissions of Buyer or Seller, and that Seller shall otherwise be afforded all rights and privileges customarily provided a mortgagee under the so-called standard mortgage clause. In the event of damage to the Property by fire or other casualty, Buyer shall promptly give notice of such damage to Seller and the insurance company.  During the term of this Agreement, Buyer shall, upon the request of Seller, furnish to Seller certificates of insurance as satisfactory evidence that such insurance is in full force and effect.  If Buyer shall fail to procure such insurance or keep the same in full force, Seller may obtain the same and add the cost thereof to the principal indebtedness herein.

9.      **INDEMNITY.**  Buyer hereby indemnifies, defends, and holds harmless Seller against and in respect of any and all liability, loss, cost, expense or damage Seller may suffer as a result of claims, demands, costs, or judgments arising out of Buyer's possession and/or ownership of the Property from and after the Initial Closing, including without limitation, damage or injuries occurring on or after the Initial Closing to any person(s) or property on or about the Property, and including any liability, loss, cost, expense or damage arising under or resulting from any breach of any of the Leases on or at any time after the Initial Closing date.  Buyer hereby indemnifies, defends, and holds harmless Seller against and in respect of any and all liability, loss, cost, expense or damage Seller may suffer as a result of any breach of, or failure by Buyer to perform, any of its representations, warranties, covenants or agreements in this Agreement or any schedule, certificate, exhibit, or other instrument furnished or to be furnished by Buyer under this Agreement on or after the Initial Closing. Indemnification shall include any interest, penalties, and reasonable attorney's fees.  The indemnity obligations of this Section shall survive the Initial Closing and the Final Closing.

**10.**   ASSIGNMENTS/SUBLEASE.  Buyer may not assign this Agreement or delegate any duties hereunder with the prior written consent of Seller, which consent may be granted, withheld or conditioned in Seller's sole and absolute discretion.

**11.**   IMPROVEMENTS.   Any proposed material improvements or alterations to the Property, including but not limited to structural changes to the Property, are prohibited without the prior written consent of Seller and Lender.

**12.**   DEFAULT; CURE; REMEDIES.

a.   EVENTS OF DEFAULT.  Either party may declare default for failure to perform or abide by any of the terms, conditions, representations, warranties, or other covenants of this Agreement.

b.   NOTICE OF SELLER DEFAULT.  Upon Buyer's declaration of default, the Buyer must send the Seller a signed writing that includes the following: (1) express declaration of default; and (2) explanation for declaration of default.

c.   CURE OF SELLER DEFAULT.  Upon Seller's receipt of a notification of default for any reason, the Seller shall have thirty (30) days from receipt of notification to cure the default.  If Seller cures a default as specified in this Agreement, Seller shall not be considered to have been in default under this Agreement.

d.   CANCELLATION OF CONTRACT FOR DEED BY NOTICE.   Upon default by Buyer, Seller shall, within a reasonable time after such default, cause a written notice to be served upon Buyer in compliance with NDCC 32-18-03 or any successor thereto. The contents of said notice shall comply with the requirements of NDCC 32-18-02 or any successor thereto.

e.   CURE OF BUYER DEFAULT.  The time allowed to cure a default after service of the written notice provided in subsection (d), shall be as stated in NDCC 32-18-04 or any successor thereto. Subject to and without limitation of the foregoing sentence: (i) if the amount claimed due under this Agreement is more than sixty-six and two-thirds percent of the original Contract Balance, the time allowed to correct the default shall be six months from the date of service of the written notice provided in subsection (d). above; or (ii) if the amount claimed is less than sixty-six and two-thirds percent of the original Contract Balance, the time allowed for Buyer to correct the default shall be one year.  If Buyer cures the default within the time proscribed, by making payments together with the cost of service, this Agreement shall be reinstated and remain in full force and effect as if no default has occurred.  If Buyer does not cure the default within the time proscribed, such default shall be sufficient to cancel all obligations hereunder on the part of Seller and fully reinvest Seller with all right, title, and interest hereby agreed to be conveyed, and Buyer shall forfeit all payments made on this Agreement, and Seller shall have the right to re-enter and take possession of the described Property.

f.   NOTICE BEFORE CANCELLATION BY ACTION. Before instituting suit for cancellation of this Agreement by action, Seller shall provide Buyer a signed writing that includes (1) an

express declaration of default; (2) an explanation for declaration for default; and (3) an express declaration of Seller's intent to institute suit for cancellation of this Agreement by action.

g.    CURE OF BUYER DEFAULT—CANCELLATION BY ACTION.  Upon Buyer's receipt of a notification of default from Seller pursuant to subsection (f). above, the Buyer shall have thirty (30) days from receipt of such notification to cure the default.  If Buyer cures the default as specified in this Agreement, the Buyer shall not be considered to have been in default under this Agreement.  If Buyer does not cure the default within thirty (30) days, Seller shall have the right to immediate cancellation and termination of this Agreement by judicial action. In addition to and without limitation of the foregoing, if Buyer does not cure the default within thirty (30) days, then to the fullest extent permitted by applicable law, Seller may, at its option, declare the entire Contract Balance and all accrued interest thereof, and all other amounts due to Seller pursuant to this Agreement, immediately due and payable in full, and any judicial action for cancellation of this Agreement shall be predicated upon such accelerated amounts and any right to "cure the default," "reinstate"," or "redeem" shall be predicated upon the full payment of such all accelerated amounts.

h.    EFFECT OF CANCELLATION BY NOTICE OR ACTION.  In the event of cancellation of this Agreement by notice or by action, all improvements made upon the Property and all payments made by Buyer pursuant to this Agreement shall belong to Seller as liquidated damages for breach of this Agreement. Neither the extension of time, nor any waiver by Seller of Seller's rights to declare this Agreement forfeited by reason of any breach shall in any manner affect Seller's right to cancel this Agreement because of defaults subsequently occurring, and no extension of time shall be valid unless agreed to in writing. Upon cancellation of this Agreement, Buyer shall surrender possession of the Property to Seller and shall leave the Property in a clean, well kept, and maintained condition without the need for any repairs to the Property for defects which did not exist at the time of execution of this Agreement. If Buyer fails to return the Property to Seller in accordance with the terms of this Section, then the cost of repairing such damages shall be payable by the Buyer to the Seller.

i.    PROTECTION OF INTERESTS.  If Buyer fails to pay any sum of money required under the terms of this Agreement or fails to perform any of the Buyer's obligations as set forth in this Agreement, Seller may, at Seller's option (but without obligation to do so), pay the same or cause the same to be performed, or both, and the amounts so paid by Seller and the cost of such performance, as applicable shall be immediately due and payable by Buyer to Seller, with interest at the rate stated in Section 2 of this Agreement, as an additional amount due Seller under this Agreement. For the avoidance of doubt, any payment made by Seller pursuant to this Section shall not constitute a waiver of any of Seller's rights or remedies hereunder, and, further Buyer's failure to repay Seller any amounts due with interest pursuant to this Section within 10 days following notice of the same, shall constitute a default entitling Seller to exercise all of Seller's rights and remedies under this Agreement.

13.    ADDITIONAL COVENANTS OF MAINTENANCE, REPAIR, COMPLIANCE WITH LAW, USE, ETC., OF BUYER.  After the Initial Closing, in addition to, and without limitation of, all other covenants and conditions of this Agreement to be performed and satisfied by Buyer, Buyer shall:

a.    Keep, repair and maintain the Property in good condition and repair, free from waste, ordinary wear and tear excepted; in addition to and without limitation of the generality of the foregoing.

b.    Pay all operating, management, maintenance and all other costs and expenses of the Property.

c.    Comply with all requirements of statutes, ordinances, rules, regulations, orders, decrees and other requirements of law relating to the Property or any part thereof by any federal, state or local authority.

d.    Pay when due all charges for utilities or services, including, but not limited to, electricity, water, gas, telephone, sanitary sewer, and trash and garbage removal, supplied to the Property, and upon request of Seller shall furnish receipts to Seller showing such payment.

e.    Make and pay all capital expenditures in a manner and amount required to preserve the value and condition of the Property.

f.    not remove or demolish any buildings, improvements, or fixtures now or later located on the Property, nor commit or allow waste of or at the Property.

g.    Not grant, suffer or permit the attachment of any liens, mortgages, judgments, or other monetary encumbrances of any kind without the prior written consent of Seller, which consent may be withheld in Seller's sole and absolute discretion.

h.    Not grant, suffer or permit any easements, restrictions, covenants, or other non-monetary encumbrances of any kind to against the Property, without Seller's prior written consent, such consent not to be unreasonably withheld.

**14.    EXECUTORY CONTRACTS.**  The parties agree that this Agreement constitutes an executory contract as defined at and used in 11 U.S.C. §365, as now written or as it may hereafter be amended.

**15.    OPERATION OF PREMISES.**  From and after the execution of this Agreement until the Initial Closing, Seller shall be responsible for any risk of loss.  From and after Initial Closing, Buyer shall protect and preserve the value of the Property for the term of this Agreement.

**16.    AS-IS SALE.**  Prior to Initial Closing, Buyer will have adequate opportunity to inspect the Property and all aspects thereof, including but not limited to the physical and legal aspects thereof. Subject only to the express representations and warranties of Seller set forth in Section 5 hereof, Buyer agrees to accept the Property in its "AS-IS" "WITH ALL FAULTS" condition as of the Initial Closing.

**17.    CONFIDENTIALITY.**  This Agreement and any documents obtained in the course of the transaction contemplated herein shall remain confidential and shall not be disclosed to any party not similarly agreeing to hold such information on a confidential basis, except to the extent

such disclosure is otherwise required by applicable law or is reasonably necessary to carry out the terms of, and transactions contemplated by, this Agreement.

18.    LOSS/CASUALTY/CONDEMNATION. From and after the Initial Closing, if all or any part of the Property is taken in condemnation proceedings instituted under power of eminent domain or is conveyed in lieu thereof under threat of condemnation, or is damaged by fire or other casualty, the money paid pursuant to such condemnation or conveyance in lieu thereof or insurance proceeds, as applicable, shall in any such case (unless otherwise elected and agreed by both Seller and Lender, in their respective sole and absolute discretions, and subject in any case to all requirements and rights of Lender set forth in the Mortgage Documents) be applied to payment of the amounts payable by Buyer under this Agreement, even if such amounts are not then due to be paid. Such amounts shall be applied in the same manner as a prepayment as provided in Section 2 of this Agreement. Such payments shall not postpone the due date of Monthly Installments to be paid pursuant to this Agreement or change the amount of such installments. The balance of such condemnation proceeds or insurance proceeds, as applicable and if any, following payment in full of the entire Purchase Price, including the Contract Balance and any other amounts that become due hereunder, shall be the property of Buyer.

19.    TIME OF THE ESSENCE. Time is of the essence hereof, and if any payments or any other condition hereof is not made, tendered, or performed by Buyer or Seller as herein provided, either party may declare this Agreement breached by the other party.

20.    BENEFIT. This Agreement shall inure to the benefit of and be binding upon the parties hereto and also upon their respective heirs, representatives, successors and permitted assigns. This Agreement does not and is not intended to confer any rights or remedies upon any person, persons, or entity other than the parties hereto

21.    ENTIRE AGREEMENT; AMENDMENT; WAIVER; SEVERABILITY. This Agreement, including all "WHEREAS" paragraphs, exhibits, and attachments, contains the entire agreement of the parties and supersedes all prior written and oral agreements. It may not be changed orally but only by an agreement in writing signed by all parties. A waiver of any term or provision shall not be construed as a waiver of any other term or provision or as a waiver of subsequent performance of the same provision of this Agreement.

22.    SURVIVAL OF REPRESENTATIONS, WARRANTIES AND COVENANTS. Except as otherwise provided in this Agreement, the representations, warranties, and covenants contained herein, and all other rights, duties, and obligations hereunder, shall survive Initial Closing and Final Closing.

23.    DRAFTING PRESUMPTION. Buyer and Seller agree that they participated in the drafting of this Agreement and, in the event that any dispute arises in the interpretation or construction of this Agreement, no presumption shall arise that either one party or the other drafted this Agreement.

24.     **NOTICE OF CONTRACT FOR DEED.** As part of Initial Closing, the parties shall execute and record a Memorandum of Contract for Deed of substantially the same substance and form as **Exhibit C**. The parties shall not record this Agreement.

25.     **FURTHER ASSURANCES.** Each party, upon the request of the other, agrees to perform any further acts, and to execute and deliver any other documents, which are reasonably necessary to carry out the provisions of this Agreement.

26.     **NOTICES.** Any notice provided for or permitted herein or that may otherwise be appropriate may be delivered in person to the other party or may be sent by United States certified mail, postage prepaid, return receipt requested, addressed as follows:

| To Seller: | To Buyer: |
|---|---|
| DFI AU, LLC<br>Attn: Bill Rothman<br>210 Broadway N, Suite 300,<br>Fargo, North Dakota 58102. | Jade Nielsen Properties, LLC<br>Attn:  Jade Nielsen<br>302 University Dr N<br>Fargo, ND 58102 |

Notice by certified mail shall be considered delivered upon actual receipt or refusal of service. A party may change its address for notice by giving appropriate notice thereof in writing to the other party.

27.     **QUIET ENJOYMENT.** From and after Initial Closing, upon and subject to Buyer observing and performing all of the covenants, conditions and provisions on Buyer's part to be observed and performed hereunder, Buyer shall have quiet possession of the Property, free of interference by Seller or those lawfully claiming by or under Seller or any other person or entity, subject to the Permitted Encumbrances. Following Initial Closing, Buyer shall be entitled to possession of the Property, with the exception of and subject to the Leases and all other Permitted Encumbrances.

28.     **GOVERNING LAW.** This Agreement shall be governed under the laws of the State of North Dakota, without regard to its conflict of laws principles. Any dispute having its origins in the provisions of this Agreement shall be venued in the Courts of the State of North Dakota, East Central Judicial District, Cass County, or the United States District Court for the District of North Dakota located in Fargo, North Dakota. The parties hereby irrevocably consent to the jurisdiction of such courts for purposes of this Agreement.

29.     **BROKERAGE.** Buyer and Seller acknowledge that no person, firm or corporation has or will have, as a result of any act or omission of Buyer or Seller, any right, interest, or valid claim against Buyer or Seller for any commission, fee, or other compensation as a finder or broker in connection with the transactions contemplated by this Agreement. The parties shall indemnify and defend each other against any loss, liability and expense (including, but not limited to,

attorneys' fees, expert fees, court costs, costs of investigation, and settlement costs) relating to any brokerage or finder's fees, commission, or other such compensation.

30.    **EXPENSES**.  Both parties to this Agreement shall bear their own expenses in connection with the transaction contemplated herein except as hereinbefore specifically provided.

31.    **COUNTERPARTS**.  This Agreement may be executed in several counterparts, each of which when executed shall be deemed to be an original, and such counterparts shall, together, constitute and be one and the same instrument.  This Agreement may be executed by email or facsimile, which emailed or faxed signature pages shall constitute a binding obligation on all parties hereto.

32.    **SEVERABILITY**.  In case any provision of this Agreement shall be invalid, illegal, or unenforceable, it shall, to the extent possible, be modified in such manner as to be valid, legal, and enforceable, but so as to most nearly retain the intent of the parties, and if such modification is not possible, such provisions shall be severed from this Agreement, and in either case, the validity, legality, and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

33.    **LEGAL REPRESENTATION**.  Buyer and Seller, by their signatures below, agree and acknowledge that this Agreement is a legally binding document.  Buyer and Seller, by their signatures below, further agree and acknowledge that they have been provided copies of this Agreement and that they have reviewed such Agreement with the assistance of legal counsel or have chosen voluntarily not to do so, and that they understand and freely sign this Agreement.

34.    **ATTORNEYS' FEES AND COSTS**.  The prevailing party in any litigation arising hereunder shall be entitled to its reasonable attorneys' fees and court costs and expenses.

35.    **RIGHT TO INSPECT**.  During the term of this Agreement, Buyer agrees to permit Seller or Seller's agents to inspect or examine the Property at any reasonable time, provided Buyer first receives notice.

*[Signature Page to Follow]*

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands on the day and year first above written.

**SELLER**

DFI AU LLC

By: _____

Its: _CFO/VP_____

**BUYER**

Jade Nielsen Properties, LLC

By: _____

Its: _President_____

*[Exhibits Follow]*

*[Remainder of this Page is Intentionally Blank]*

**EXHIBIT A – INITIAL TITLE WORK**

## COMMITMENT FOR TITLE INSURANCE

ISSUED BY
STEWART TITLE GUARANTY COMPANY

## NOTICE

**IMPORTANT - READ CAREFULLY:**  THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES.  ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE.  THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

## COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I - Requirements; Schedule B, Part II - Exceptions; and the Commitment Conditions, Stewart Title Guaranty Company, a Texas corporation (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment.  This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Amount of Insurance and the name of the Proposed Insured.

If all of the Schedule B, Part I—Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

## COMMITMENT CONDITIONS

1.  DEFINITIONS
    a.  "Discriminatory Covenant": Any covenant, condition, restriction, or limitation that is unenforceable under applicable law because it illegally discriminates against a class of individuals based on personal characteristics such as race, color, religion, sex, sexual orientation, gender identity, familial status, disability, national origin, or other legally protected class.
    b.  "Knowledge" or "Known":  Actual knowledge or actual notice, but not constructive notice imparted by the Public Records.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Stewart Title Guaranty Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I - Requirements; and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited. Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

## COMMITMENT FOR TITLE INSURANCE

ISSUED BY
STEWART TITLE GUARANTY COMPANY

    c.   "Land": The land described in Item 5 of Schedule A and improvements located on that land that by State law constitute real property. The term "Land" does not include any property beyond that described in Schedule A, nor any right, title, interest, estate, or easement in any abutting street, road, avenue, alley, lane, right-of-way, body of water, or waterway, but does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.

    d.   "Mortgage": A mortgage, deed of trust, trust deed, security deed, or other real property security instrument, including one evidenced by electronic means authorized by law.

    e.   "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.

    f.   "Proposed Amount of Insurance": Each dollar amount specified in Schedule A as the Proposed Amount of Insurance of each Policy to be issued pursuant to this Commitment.

    g.   "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.

    h.   "Public Records": The recording or filing system established under State statutes in effect at the Commitment Date under which a document must be recorded or filed to impart constructive notice of matters relating to the Title to a purchaser for value without Knowledge. The term "Public Records" does not include any other recording or filing system, including any pertaining to environmental remediation or protection, planning, permitting, zoning, licensing, building, health, public safety, or national security matters.

    i.   "State": The state or commonwealth of the United States within whose exterior boundaries the Land is located. The term "State" also includes the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, and Guam.

    j.   "Title": The estate or interest in the Land identified in Item 3 of Schedule A.

2.   If all of the Schedule B, Part I-Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

3.   The Company's liability and obligation is limited by and this Commitment is not valid without:
    a.   the Notice;
    b.   the Commitment to Issue Policy;
    c.   the Commitment Conditions;
    d.   Schedule A;
    e.   Schedule B, Part I-Requirements; and
    f.   Schedule B, Part II-Exceptions; and
    g.   a counter-signature by the Company or its issuing agent that may be in electronic form.

4.   COMPANY'S RIGHT TO AMEND
    The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company is not liable for any other amendment to this Commitment.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Stewart Title Guaranty Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I - Requirements; and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**COMMITMENT FOR TITLE INSURANCE**

ISSUED BY
STEWART TITLE GUARANTY COMPANY

5.  LIMITATIONS OF LIABILITY
    a.  The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:
        i.   comply with the Schedule B, Part I-Requirements;
        ii.  eliminate, with the Company's written consent, any Schedule B, Part II-Exceptions; or
        iii. acquire the Title or create the Mortgage covered by this Commitment.
    b.  The Company is not liable under Commitment Condition 5.a. if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.
    c.  The Company is only liable under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.
    d.  The Company's liability does not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Condition 5.a. or the Proposed Amount of Insurance.
    e.  The Company is not liable for the content of the Transaction Identification Data, if any.
    f.  The Company is not obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I-Requirements have been met to the satisfaction of the Company.
    g.  The Company's liability is further limited by the terms and provisions of the Policy to be issued to the Proposed Insured.

6.  LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT; CHOICE OF LAW AND CHOICE OF FORUM
    a.  Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.
    b.  Any claim must be based in contract under the State law of the State where the Land is located and is restricted to the terms and provisions of this Commitment. Any litigation or other proceeding brought by the Proposed Insured against the Company must be filed only in a State or federal court having jurisdiction.
    c.  This Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.
    d.  The deletion or modification of any Schedule B, Part II-Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.
    e.  Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.
    f.  When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

7.  IF THIS COMMITMENT IS ISSUED BY AN ISSUING AGENT
    The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for closing, settlement, escrow, or any other purpose.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Stewart Title Guaranty Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I - Requirements; and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited. Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

Commitment for Title Insurance (07-01-2021)                                                   269921

## COMMITMENT FOR TITLE INSURANCE

ISSUED BY
STEWART TITLE GUARANTY COMPANY

8. PRO-FORMA POLICY
   The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

9. CLAIMS PROCEDURES
   This Commitment incorporates by reference all Conditions for making a claim in the Policy to be issued to the Proposed Insured. Commitment Condition 9 does not modify the limitations of liability in Commitment Conditions 5 and 6.

10. CLASS ACTION
   ALL CLAIMS AND DISPUTES ARISING OUT OF OR RELATING TO THIS COMMITMENT, INCLUDING ANY SERVICE OR OTHER MATTER IN CONNECTION WITH ISSUING THIS COMMITMENT, ANY BREACH OF A COMMITMENT PROVISION, OR ANY OTHER CLAIM OR DISPUTE ARISING OUT OF OR RELATING TO THE TRANSACTION GIVING RISE TO THIS COMMITMENT, MUST BE BROUGHT IN AN INDIVIDUAL CAPACITY. NO PARTY MAY SERVE AS PLAINTIFF, CLASS MEMBER, OR PARTICIPANT IN ANY CLASS OR REPRESENTATIVE PROCEEDING. ANY POLICY ISSUED PURSUANT TO THIS COMMITMENT WILL CONTAIN A CLASS ACTION CONDITION.

11. ARBITRATION
   The Policy contains an arbitration clause. All arbitrable matters when the Proposed Amount of Insurance is $2,000,000 or less may be arbitrated at the election of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Stewart Title Guaranty Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I - Requirements; and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

Commitment for Title Insurance (07-01-2021)                                    269921

## COMMITMENT FOR TITLE INSURANCE

ISSUED BY
STEWART TITLE GUARANTY COMPANY

**Transaction Identification Data, for which the Company assumes no liability as set forth in Commitment Condition 5.e.:**

Issuing Agent:            The Title Company
Issuing Office:           35 4th Street N, Suite 102, Fargo, ND 58102
Issuing Office 's ALTA® Registry ID:    0005101
Loan ID No.:
Commitment No.:           269921
Property Address:         1329 5th Ave N, Fargo, ND 58102

## SCHEDULE A

1.  Commitment Date:  June 6, 2024 at 6:59 a.m.

2.  Policy to be issued:

    a.
        Proposed Insured:            Jade Nielsen Properties, LLC
        Proposed Policy Amount:      $780,000.00

3.  The estate or interest in the Land at the Commitment Date is:  Fee Simple.

4.  The Title is, at the Commitment Date, vested in:

    DFI AU LLC, a North Dakota limited liability company.

5.  The Land is described as follows:

    Lot One, in Block One, of the Corrected Plat of The Edge Addition to the City of Fargo, situate in the County of Cass and the State of North Dakota.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Stewart Title Guaranty Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I - Requirements; and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited. Reprinted under license from the American Land Title Association.



ALTA Commitment for Title Insurance (07-01-2021)                                                        269921
Schedule BII

## SCHEDULE A
(Continued)

Counter Signed by:

Nicole Davidson
President
The Title Company

Frederick H. Eppinger
President and CEO

David Hisey
Secretary

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Stewart Title Guaranty Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I - Requirements; and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited. Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

ALTA Commitment for Title Insurance (07-01-2021)
Schedule BII

269921

**COMMITMENT FOR TITLE INSURANCE**

ISSUED BY
STEWART TITLE GUARANTY COMPANY

## SCHEDULE B, PART I
### Requirements

All of the following Requirements must be met:

1.  The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2.  Pay the agreed amount for the estate or interest to be insured.

3.  Pay the premiums, fees, and charges for the Policy to the Company.

4.  Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

5.  Satisfaction or Release of Mortgage executed by DFI AU LLC, to Koda, Bank, dated February 15, 2024 and given to secure the original principal amount of $622,500.00.  Said Mortgage was recorded February 21, 2024 at 12:40 p.m., as document #1706680.

6.  The 2023 real estate taxes are shown with an unpaid balance.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Stewart Title Guaranty Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I - Requirements; and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited. Reprinted under license from the American Land Title Association.


AMERICAN
LAND TITLE
ASSOCIATION

## COMMITMENT FOR TITLE INSURANCE

ISSUED BY
STEWART TITLE GUARANTY COMPANY

### SCHEDULE B, PART II
### Exceptions

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law.  This Commitment and the Policy treat any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document will be excepted from coverage.**

The Policy will not insure against loss or damage resulting from the terms and conditions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

1. Defects, liens, encumbrances, adverse claims or other matters, if any; created, first appearing in the public records or attaching subsequent to the effective date hereof, but prior to the date the proposed insured acquires of record for value the estate or interest or mortgage thereon covered by this Commitment.

2. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, and any facts, which a correct survey and inspection of the premises would disclose and which are not shown by the public records.  (Can be deleted or modified upon receipt and review of a survey)

3. Rights or claims of parties in possession, not shown by the public records. (Can be deleted or modified based on the buyer and seller signing a lien affidavit at closing that discloses any parties in possession)

4. Easements, or claims of easements, not shown by the public records.  (Can be deleted or modified upon receipt and review of a survey)

5. Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the public records. (Can be deleted based on Buyer and Seller signing a lien affidavit and if there are no other indicators that would lead us to believe that there is constructions currently or recently commenced on the property)

6. Unpatented mining claims; reservations or exceptions in patents or in Acts authorizing the issuance thereof; water rights, claims, or title to water, whether or not the matters excepted under the same are shown by the Public Records.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Stewart Title Guaranty Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I - Requirements; and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association.  All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.



ALTA Commitment for Title Insurance (07-01-2021)                                        269921
Schedule BII

## SCHEDULE B, PART II
(Continued)

7. Minerals of whatsoever kind, subsurface and surface substances, including but not limited to coal, lignite, oil, gas, uranium, clay, rock, sand and gravel in, on, under and that may be produced from the Land, together with all rights, privileges, and immunities relating thereto, whether or not appearing in the Public Records or listed in Schedule B. The Company makes no representation as to the present ownership of any such interests. There may be leases, grants, exceptions or reservations of interests that are not listed.

8. Rights of tenants under unrecorded leases.

9. Taxes and special assessments, if any, which have not been certified to the County Treasurer for collection.

   Tax Parcel Number:  01-8680-00100-000

   NOTE:  2022 and prior years taxes are paid; no search has been made of uncertified special assessments against said premises as of this date.

10. Minerals reserved in Quit Claim Deed by The Burlington Northern And Santa Fe Railway Company recorded September 6, 2000 at 2:20 p.m. as document #964352.

11. Reserved easement and covenants contained in Quit Claim Deed recorded January 28, 2016 at 8:53 a.m. as document #1469015.

12. Easements and other matters as shown on the recorded Plat of The Edge Addition recorded May 16, 2018 at 11:13 a.m. as Document #1537236.

13. Declaration of Easements filed by DFI AU LLC recorded September 11, 2018 at 9:00 a.m. as document #1546688.

14. Easements and other matters as shown on the Corrected Plat of The Edge Addition recorded November 12, 2019 at 2:41 p.m. as document #1576735.

15. Conditional Use Permit recorded April 17, 2024 at 10:32 a.m. as document #1709753.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Stewart Title Guaranty Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I - Requirements; and Schedule B, Part II - Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



## EXHIBIT B – MEMORANDUM OF CONTRACT FOR DEED

## MEMORANDUM OF CONTRACT FOR DEED

This MEMORANDUM OF CONTRACT FOR DEED is made and entered into as of June 14, 2024 (the "*Effective Date*"), by and between DFI AU, LLC, a North Dakota limited liability company with an address of 210 Broadway N, Suite 300, Fargo, North Dakota 58102 (the "*Seller*"); and Jade Nielsen Properties, LLC, a North Dakota limited liability company with an address of 302 University Drive N, Fargo, North Dakota 58102, (the "*Buyer*").

## RECITALS

WHEREAS, Seller and Buyer have entered into a Contract for Deed, dated June 14, 2024 (the "*Contract for Deed*"), pursuant to which Seller is selling to Buyer certain real estate located in Cass County, North Dakota, legally described as:

**Lot One, in Block One, of the Corrected Plat of The Edge Addition to the City of Fargo, situate in the County of Cass and the State of North Dakota.**

together with all structures and improvements located thereon, and any appurtenances attached thereto (the "*Property*");

WHEREAS, the purpose of this Memorandum of Contract for Deed is to provide notice to the public of the equitable interest of Buyer in the above-described Property;

NOW, THEREFORE, NOTICE IS HEREBY GIVEN THAT:

1. **SUBJECT TO THE CONTRACT FOR DEED.** Buyer is purchasing the above-described Property from Seller by Contract for Deed. The provisions of this instrument are subject in all respects to the provisions of the Contract for Deed, to which Contract for Deed reference must be made in connection with any matter affecting the said Contract for Deed and the sale and purchase of the above-described Property.

2. **TERM OF THE CONTRACT FOR DEED.** The Contract for Deed shall be for a term of approximately six (6) months, with the Final Closing (as defined in the Contract for Deed) required to occur by not later December 4, 2024, unless sooner satisfied or terminated.

3. **NO ENCUMBRANCES.** Pursuant to the Contract for Deed, neither Seller nor Buyer shall hereafter suffer or permit the attachment of any liens, easements, restrictions, covenants, or encumbrances of any kind to arise and attach to the Property, without the other party's written consent, except to the extent expressly permitted under the Contract for Deed.

*[Signature and Acknowledgment Pages Follow]*

IN WITNESS WHEREOF, Buyer and Seller have hereunto executed this MEMORANDUM OF CONTRACT FOR DEED effective as of the Effective Date first set forth above.

**SELLER**

DFI AU, LLC

By: _____

Its: _CFO/VP_____

**BUYER**

Jade Nielsen Properties, LLC

By: _____

Its: _President_____

**STATE OF NORTH DAKOTA** )
                                 : ss
**COUNTY OF** _Cass_____ )

> ANDREA R NELSON
> Notary Public
> State of North Dakota
> My Commission Expires Jan. 13, 2027

On this the _10th_ day of _June____, 2024, before me, the undersigned notary, personally appeared _Bill Rothman___ known to me or satisfactorily proven to be the _Vice President___ of DFI AU, LLC, a North Dakota limited liability company, that is described in and that executed the within instrument, and acknowledged to me that such limited liability company executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

< SEAL >

_____
Notary Public
My commission expires: _January 13, 2027_

**STATE OF** _North Dakota_ )
                                 : ss
**COUNTY OF** _Cass____ )

On this the _14th_ day of _June___, 2024, before me, the undersigned notary, personally appeared _Jade Nielsen_, known to me or satisfactorily proven to be the _President___ of the limited liability company that is described in and that executed the within instrument, and acknowledged to me that such limited liability company executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

< SEAL >

> BRIANNE HILDE
> Notary Public
> State of North Dakota
> My Commission Expires March 6, 2027

_____
Notary Public
My commission expires: _____

## FIRST AMENDMENT TO CONTRACT FOR DEED
1/7/2025

**THIS FIRST AMENDMENT TO CONTRACT FOR DEED** (the "Amendment") is entered into effective as of the _____ day of January, 2025 (the "Amendment Date"), by and between DFI AU LLC, a North Dakota limited liability company ("**Seller**"), and Jade Nielsen Properties, LLC, a North Dakota limited liability company ("**Buyer**").

### RECITALS

A.    Buyer and Seller entered into a Contract for Deed dated as of June 14, 2024 (the "Contract for Deed"), whereby Seller agreed to sell and transfer, and Buyer agreed to purchase, the Property.

B.    Buyer and Seller desire to further amend the Contract for Deed in certain respects.

C.    Defined terms used but not separately defined in this Amendment shall be given their meaning ascribed in the Contract for Deed.

### AGREEMENTS

In consideration of the Recitals and the following mutual agreements, the parties agree to amend the Contract for Deed as follows:

1.    **Closing and Possession.**  Section 4(c) of the Contract for Deed is deleted and replaced with:

"Buyer and Seller shall complete those certain portions of the transactions contemplated under this Agreement enumerated in Section 4(c) of this Agreement ("Final Closing"), on or prior to June 4th, 2025. Final Closing shall be held at The Title Company, 35 4th Street N, Suite 102, Fargo, North Dakota (the "Title Company")."

2.    **Binding Effect/Further Amendment/Status.**  Except as expressly amended by this Amendment, the terms and conditions set forth in the Contract for Deed remain unmodified and in full force and effect.  The Contract for Deed shall not be further amended or modified, except by a writing signed by the parties.  Buyer and Seller acknowledge and agree that, as of the Amendment Date, neither of them is aware of any fact or circumstance that has resulted in, or could give rise to, a breach by the other of the Contract for Deed.

3.    **Counterparts/Facsimile Signatures.**  This Amendment may be executed in any number of counterparts, all of which taken together shall constitute one, complete Amendment.  A copy of this Amendment delivered as or by .pdf, facsimile or other electronic means containing a party's signature shall be deemed such party's original, binding signature.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the Amendment Date.

**SELLER:**                                      **BUYER:**

**DFI AU LLC**                                   **Jade Nielsen Properties, LLC**


By: Bill Rothman
Bill Rothman, Vice President

By: Jade Nielsen
Jade Nielsen, President

## SECOND AMENDMENT TO CONTRACT DEED

THIS SECOND AMENDMENT TO CONTRACT FO——ED (the "Amendment") is entered into effective as of the __17__ day of June 2025 (the "Amendment Date"), by and between DFI AU LLC, a North Dakota limited liability company ("**Seller**"), and Jade Nielsen Properties, LLC, a North Dakota limited liability company ("**Buyer**").

### RECITALS

A.     Buyer and Seller entered into a Contract for Deed dated as of June 14, 2024 (the "Contract for Deed"), and as amended by the First Amendment dated as of January 7th, 2025 (the "First Amendment"), whereby Seller agreed to sell and transfer, and Buyer agreed to purchase, the Property.

B.     Buyer and Seller desire to further amend the Contract for Deed and First Amendment in certain respects.

C.     Defined terms used but not separately defined in this Amendment shall be given their meaning ascribed in the Contract for Deed.

### AGREEMENTS

In consideration of the Recitals and the following mutual agreements, the parties agree to amend the Contract for Deed as follows:

1.     **Closing and Possession.** Section 1 of the First Amendment is deleted and replaced with:

"Buyer and Seller shall complete those certain portions of the transactions contemplated under this Agreement enumerated in Section 4(c) of this Agreement ("Final Closing"), on or prior to December 4th, 2025. Buyer shall advance to the Seller an additional $50,000.00 non-refundable payment as of the effective date of this agreement. The remaining principle due at Final Closing will be $570,000.00, after the additional $50,000.00 payment is received by Seller. Final Closing shall be held at The Title Company, 35 4th Street N, Suite 102, Fargo, North Dakota (the "Title Company")."

2.     **Payments.** Seller will have to renegotiate the payments of interest only on a $622,500 promissory note with an interest rate of 7.50%. If the monthly installments change because of this renegotiation, the buyer agrees to pay the renegotiated payment amount.

3.     **Binding Effect/Further Amendment/Status.** Except as expressly amended by this Amendment, the terms and conditions set forth in the Contract for Deed remain unmodified and in full force and effect. The Contract for Deed shall not be further amended or modified, except by a writing signed by the parties. Buyer and Seller acknowledge and agree that, as of the

1

Amendment Date, neither of them is aware of any fact or circumstance that has resulted in, or could give rise to, a breach by the other of the Contract for Deed.

4.    **Counterparts/Facsimile Signatures.** This Amendment may be executed in any number of counterparts, all of which taken together shall constitute one, complete Amendment. A copy of this Amendment delivered as or by .pdf, facsimile or other electronic means containing a party's signature shall be deemed such party's original, binding signature.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the Amendment Date.

**SELLER:**                                    **BUYER:**

**DFI AU LLC**                                 **Jade Nielsen Properties, LLC**

By: _Bill Rothman_                            By: _____
     7DAAD979DAAC4E6...
Bill Rothman, Vice President                  Jade Nielsen, President

2

**THIRD AMENDMENT TO CONTRACT FOR DEED**

**THIS THIRD AMENDMENT TO CONTRACT FOR DEED** (the "Amendment") is entered into effective as of the 18th day of August 2025 (the "Amendment Date"), by and between DFI AU LLC, a North Dakota limited liability company ("**Seller**"), and Jade Nielsen Properties, LLC, a North Dakota limited liability company ("**Buyer**").

**RECITALS**

A.      Buyer and Seller entered into a Contract for Deed dated as of June 14, 2024 (the "Contract for Deed"),  as amended by the First Amendment dated as of January 7th, 2025 (the "First Amendment"), and as amended by the Second Amendment dated as of July 17, 2025, whereby Seller agreed to sell and transfer, and Buyer agreed to purchase, the Property.

B.      Buyer and Seller desire to further amend the Contract for Deed, First Amendment, and Second Amendment in certain respects.

C.      Defined terms used but not separately defined in this Amendment shall be given their meaning ascribed in the Contract for Deed.

AGREEMENTS

In consideration of the Recitals and the following mutual agreements, the parties agree to amend the Contract for Deed as follows:

1.      **Closing and Possession.**  Section 1 of the First Amendment is deleted and replaced with:

"Buyer and Seller shall complete those certain portions of the transactions contemplated under this Agreement enumerated in Section 4(c) of this Agreement ("Final Closing"), on or before December 4th, 2025. Buyer shall give Seller an additional $20,000.00 non-refundable down payment no later than September 15, 2025. The remaining principal due at Final Closing will be $600,000.00, after the Seller receives the additional $20,000.00 payment.  Final Closing shall be held at The Title Company, 35 4th Street N, Suite 102, Fargo, North Dakota (the "Title Company").

2.  **Payments.** Seller will have to renegotiate the payments of interest only on a $622,500 promissory note with an interest rate of 7.50%. If the monthly installments change because of this renegotiation, the buyer agrees to pay the renegotiated payment amount.

3.      **Binding Effect/Further Amendment/Status.**  Except as expressly amended by this Amendment, the terms and conditions set forth in the Contract for Deed remain unmodified and in full force and effect.  The Contract for Deed shall not be further amended or modified, except by a writing signed by the parties. Buyer and Seller acknowledge and agree that, as of the

1

Amendment Date, neither of them is aware of any fact or circumstance that has resulted in, or could give rise to, a breach by the other of the Contract for Deed.

4.      **Counterparts/Facsimile Signatures.**  This Amendment may be executed in any number of counterparts, all of which taken together shall constitute one, complete Amendment.  A copy of this Amendment delivered as or by .pdf, facsimile or other electronic means containing a party's signature shall be deemed such party's original, binding signature.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the Amendment Date.

**SELLER:**                                          **BUYER:**


**DFI AU LLC**                                       **Jade Nielsen Properties, LLC**

DocuSigned by:                                       Signed by:

By: William Rothman                                 By: Jade Nielsen
    6AE55F0D56A64DE...                                   C2E2BEB9E8674E6...
Bill Rothman, Vice President                        Jade Nielsen, President

## FOURTH AMENDMENT TO CONTRACT FOR DEED

**THIS FOURTH AMENDMENT TO CONTRACT FOR DEED** (the "Amendment") is entered into effective as of the 4th day of December 2025 (the "Amendment Date"), by and between DFI AU LLC, a North Dakota limited liability company ("**Seller**"), and Jade Nielsen Properties, LLC, a North Dakota limited liability company ("**Buyer**").

### RECITALS

A.      Buyer and Seller entered into a Contract for Deed dated as of June 14, 2024 (the "Contract for Deed"), as amended by the First Amendment dated as of January 7th, 2025 (the "First Amendment"), and as amended by the Second Amendment dated as of July 17, 2025, as amended by the Third Amendment dated as of August 18th, 2025 (the "Third Amendment"), whereby Seller agreed to sell and transfer, and Buyer agreed to purchase, the Property.

B.      Buyer and Seller desire to further amend the Contract for Deed, First Amendment, Second Amendment, and Third Amendment in certain respects.

C.      Defined terms used but not separately defined in this Amendment shall be given their meaning ascribed in the Contract for Deed.

### AGREEMENTS

In consideration of the Recitals and the following mutual agreements, the parties agree to amend the Contract for Deed as follows:

1.      **Closing and Possession.** Section 1 of the First Amendment is deleted and replaced with:

"Buyer and Seller shall complete those certain portions of the transactions contemplated under this Agreement enumerated in Section 4(c) of this Agreement ("Final Closing"), on or before June 1st, 2026. Buyer shall give Seller an additional $20,000.00 non-refundable down payment no later than January 31, 2025. The remaining principal due at Final Closing will be $582,500.00, after the Seller receives the additional $20,000.00 payment.  Final Closing shall be held at The Title Company, 35 4th Street N, Suite 102, Fargo, North Dakota (the "Title Company")."

2.      **Payments.** Seller will have to renegotiate the payments of interest only on a $582,500.00 promissory note with an interest rate of 7.50%. If the monthly installments change because of this renegotiation, the buyer agrees to pay the renegotiated payment amount.

3.      **Past Due Payments.** Buyer shall pay past due payments December ($3,891.15), January ($3,761.98), Loan Extension Fee ($750) and Principal Payment ($20,000) by January 31st, 2026.

1

4.    **Binding Effect/Further Amendment/Status.**  Except as expressly amended by this Amendment, the terms and conditions set forth in the Contract for Deed remain unmodified and in full force and effect.  The Contract for Deed shall not be further amended or modified, except by a writing signed by the parties. Buyer and Seller acknowledge and agree that, as of the Amendment Date, neither of them is aware of any fact or circumstance that has resulted in, or could give rise to, a breach by the other of the Contract for Deed.

5.    **Counterparts/Facsimile Signatures.**  This Amendment may be executed in any number of counterparts, all of which taken together shall constitute one, complete Amendment.  A copy of this Amendment delivered as or by .pdf, facsimile or other electronic means containing a party's signature shall be deemed such party's original, binding signature.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the Amendment Date.

**SELLER:**                                    **BUYER:**

**DFI AU LLC**                                 **Jade Nielsen Properties, LLC**

Signed by:

By: _____          By: _____
548CD1356C5A4D8...
Mike Ahmendinger, President                Jade Nielsen, President

2

## EXHIBIT B

**Memorandum of Contract for Deed Document No. 1713714**


EXHIBIT
B

PAGE: 1 of 3    MEMCD    1713714
The Title Company-Commercial    6/17/2024 9:05 AM
Recorded Electronically    $20.00

## MEMORANDUM OF CONTRACT FOR DEED

This MEMORANDUM OF CONTRACT FOR DEED is made and entered into as of June 14th, 2024 (the "***Effective Date***"), by and between DFI AU, LLC, a North Dakota limited liability company with an address of 210 Broadway N, Suite 300, Fargo, North Dakota 58102 (the "***Seller***"); and Jade Nielsen Properties, LLC, a North Dakota limited liability company with an address of 302 University Drive N, Fargo, North Dakota 58102, (the "***Buyer***").

## RECITALS

**WHEREAS**, Seller and Buyer have entered into a Contract for Deed, dated June 14th, 2024 (the "***Contract for Deed***"), pursuant to which Seller is selling to Buyer certain real estate located in Cass County, North Dakota, legally described as:

**Lot One, in Block One, of the Corrected Plat of The Edge Addition to the City of Fargo, situate in the County of Cass and the State of North Dakota.**

together with all structures and improvements located thereon, and any appurtenances attached thereto (the "***Property***");

**WHEREAS**, the purpose of this Memorandum of Contract for Deed is to provide notice to the public of the equitable interest of Buyer in the above-described Property;

**NOW, THEREFORE**, NOTICE IS HEREBY GIVEN THAT:

1.    **SUBJECT TO THE CONTRACT FOR DEED.** Buyer is purchasing the above-described Property from Seller by Contract for Deed. The provisions of this instrument are subject in all respects to the provisions of the Contract for Deed, to which Contract for Deed reference must be made in connection with any matter affecting the said Contract for Deed and the sale and purchase of the above-described Property.

2.    **TERM OF THE CONTRACT FOR DEED.** The Contract for Deed shall be for a term of approximately six (6) months, with the Final Closing (as defined in the Contract for Deed) required to occur by not later December 4, 2024, unless sooner satisfied or terminated.

3.    **NO ENCUMBRANCES.** Pursuant to the Contract for Deed, neither Seller nor Buyer shall hereafter suffer or permit the attachment of any liens, easements, restrictions, covenants, or encumbrances of any kind to arise and attach to the Property, without the other party's written consent, except to the extent expressly permitted under the Contract for Deed.

*[Signature and Acknowledgment Pages Follow]*

01-8680-00100-000

PAGE: 2 of 3      MEMCD            1713714
The Title Company-Commercial      6/17/2024 9:05 AM
Recorded Electronically                    $20.00

IN WITNESS WHEREOF, Buyer and Seller have hereunto executed this MEMORANDUM OF CONTRACT FOR DEED effective as of the Effective Date first set forth above.

**SELLER**

DFI AU, LLC

By: _____

Its: _CFO/VP_____

**BUYER**

Jade Nielsen Properties, LLC

By: _____

Its: _President_____

**STATE OF NORTH DAKOTA** )
                                                    : ss
**COUNTY OF** _Cass_____ )

ANDREA R NELSON
Notary Public
State of North Dakota
My Commission Expires Jan. 13, 2027

On this the _10th_ day of _June_____, 2024, before me, the undersigned notary, personally appeared _Bill Rothman_____, known to me or satisfactorily proven to be the _Vice President_ of DFI AU, LLC, a North Dakota limited liability company, that is described in and that executed the within instrument, and acknowledged to me that such limited liability company executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

< SEAL >

_____
Notary Public
My commission expires: _January 13, 2027_

**STATE OF** _North Dakota_ )
                                                : ss
**COUNTY OF** _Cass_____ )

On this the _14th_ day of _June___, 2024, before me, the undersigned notary, personally appeared _Jade Nielsen_, known to me or satisfactorily proven to be the _President_ of the limited liability company that is described in and that executed the within instrument, and acknowledged to me that such limited liability company executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

< SEAL >

BRIANNE HILDE
Notary Public
State of North Dakota
My Commission Expires March 6, 2027

_____
Notary Public
My commission expires:_____



**Re:    In Re: Jade Presents, LLC and Tickets 300, Jointly Administered**
**Case No. 26-30438 and Case No.: 26-30439 Jointly Administered**

STATE OF NORTH DAKOTA    )
                                                    )   SS        **CERTIFICATE OF SERVICE**
COUNTY OF CASS              )

Katherine Johnson, being first duly sworn, does depose and say: she is of legal age and not a party to or interested in the above-entitled matter.

On July 21, 2026, affiant caused the following document(s):

**EXHIBITS A AND B TO MOTION FOR RELIEF FROM AUTOMATIC STAY**

to be served by United States postal mail on:

Jade Presents, LLC
1320 1st Ave N
Fargo, ND 58102-4202

to be served electronically to the following:

all CM/ECF participants

_/s/ Katherine Johnson_
Katherine Johnson

Subscribed and sworn to before me this 21st day of July, 2026.

_/s/ Alexus Abel_
(SEAL)                              Notary Public, Cass County, North Dakota

4923-3779-0655 v.1