IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re:<br><br>JADE PRESENTS, LLC<br><br>Debtor. | Case No. 26-30438<br>(Chapter 11) |
| In re:<br><br>TICKETS300, LLC<br><br>Debtor | Case No. 26-30439<br>(Chapter 11)<br><br>(Jointly Administered) |
| JADE PRESENTS, LLC<br><br>Plaintiff,<br><br>v.<br><br>ROCKET CAPITAL NY, LLC,<br><br>Defendant. | Adv. Case No. 26-07017 |

**COMPLAINT**

Comes now Jade Presents, LLC ("Jade Presents" or the "Debtor"), by and through undersigned counsel, pursuant to Federal Rule of Bankruptcy Procedure 7003 and Federal Rule of Civil Procedure 3, and as and for its complaint against Rocket Capital NY, LLC ("Rocket" or the "Defendant") states as follows:

**Introduction**

1. In the two years immediately preceding the filing of a petition for bankruptcy relief, the Debtor paid at least $601,233.02 to the Defendant, pursuant to at least two merchant cash advance ("MCA") transactions.

2. The MCA transactions are each titularly sales of future receivables, in exchange for upfront cash.

3. If the MCA transactions are, in fact, actual sales of future receivables, each such transaction (and every payment made thereupon) is a constructively fraudulent conveyance, being a sale made at the time the Debtor was insolvent, with Jade receiving well less than reasonably equivalent value for the receivables putatively sold.

4. If the MCA transactions are not, in fact, actual sales of future receivables, each such transaction is a poorly-disguised usurious loan that, pursuant to New York law (which governs each transaction, per the Defendant's own agreement), is both criminal in nature and—by virtue of a separate portion of Empire State law—civilly actionable.

5. Regardless of whether made pursuant to sales agreements or loans, each payment made to the Defendant, by the Debtor, constitutes a fraudulent conveyance and is thusly avoidable under both title 11 of the United States Code (the "Bankruptcy Code") and North Dakota law.

6. The Debtor accordingly now brings suit to avoid at least $601,233.02 in fraudulent conveyances, seeking a money judgment as against the Defendant for all monies paid pursuant to the aforesaid agreements.

**Parties**

7. The Debtor is a limited liability company, formed pursuant to the laws of the State of North Dakota on or about January 11, 2006, that filed a petition for chapter 11 relief, pursuant to section 301 of the Bankruptcy Code, on or about June 6, 2026.

8. Rocket is a limited liability company, formed pursuant to the laws of the State of New York on or about June 30, 2021, carrying on the business of entering into MCA agreements.

## Jurisdiction and Venue

9. This Honorable Court enjoys jurisdiction over the instant proceeding pursuant to the allowances of section 1334 of title 28 of the United States Code, insofar as the causes of action set forth herein arise under the Bankruptcy Code.

10. This Honorable Court further enjoys jurisdiction over the instant proceeding pursuant to the allowances of section 1332 of title 28 of the United States Code, insofar as this case is between citizens of different states and the amount in controversy exceeds Seventy Five Thousand Dollars and No Cents ($75,000.00).

11. Venue is properly laid in this Honorable Court pursuant to the allowances of section 1409 of title 28 of the United States Code insofar as the chapter 11 case of the Debtor is pending in this Honorable Court.

12. To whatever extent this case may be brought in the United States District Court for the District of North Dakota, on account of there existing diversity jurisdiction *sub judice*, this case is nonetheless properly referred to this Honorable Court insofar as the case relates to an active bankruptcy proceeding.

## General Allegations: MCA Industry

13. This case concerns the MCA industry, of which Rocket is a major participant.

14. An MCA transaction is ordinarily a disguised form of predatory loan, whereby an entity like Rocket tenders funds to a small business and, in return, receives an aggressive repayment commitment that often exceeds 60% per annum.

15. The fiction of an MCA transaction is that the arrangement is not a loan but, rather, a sale of "future receivables," with a merchant receiving cash in exchange for parting with a percentage of future revenues.

16. Unlike a traditional factoring arrangement, however, the merchant in an MCA transaction is not selling any cognizable, extant receivable or pool of receivables; in an MCA transaction, the merchant is selling a portion of *all* future receivables, a wholly inchoate and legally inalienable asset.

17. As at least one court has observed, the entire construct of an MCA transaction ". . . is both a metaphysical and legal impossibility. . . . A transfer of future rights to payment—that is, rights that as yet do not exist—cannot occur unless and until the rights to payment arise." *M Design Vill. v. Versant Funding LLC (In re M Design Vill.)*, 2025 WL 2088887, 2025 Bankr. LEXIS 1778, at *19 (Bankr. D.N.J. July 24, 2025).

18. Also unlike a traditional factoring arrangement, an MCA transaction ordinarily contains provisions that ensure the merchant is, in reality, repaying a loan, with the terms of collection having little-to-nothing to do with the merchant's actual receivables.

19. At bottom, MCA transactions are structured to maximize the chances of MCA entities being repaid their monies—with interest—regardless of the future performance of a given merchant, and key to such is a combination of (i) hair-trigger default provisions that effectively accelerate debt or an owner's guaranty of repayment; (ii) overly-complex reconciliation provisions that make changing payment sums prohibitively difficult and that never allow for the gross collectable sum to be altered in any event; and (iii) pressure tactics from employees of MCA entities.

20. Rocket is one of the preeminent entities in the burgeoning national MCA industry.

**General Allegations: Parties' Relationship**

21. The Debtor and the Defendant entered into at least two purchase agreements (the "Purchase Agreements"), pursuant to which the Debtor putatively sold percentages of future, undefined receivables to the Defendant in exchange for cash.

22. A margin of at least 38% separated the amount paid to the Debtor from the amount of receivables sold to Rocket, in each instance, with the timelines for repayment resulting in projected annualized returns of 61.92% and 78.01% to Rocket, on monies disbursed for the two known Purchase Agreements.

23. By way of anecdote, a Purchase Agreement entered into in September 2024 provides for the sale of $350,000.00 in future receivables, in exchange for a payment of $250,000.00, with weekly payments of $13,465.00 to be made by the Debtor. This is a 40% markup that annualizes to a 78.01% return for Rocket based on the repayment timetable (with the annualized return being higher than the markup since repayment is scheduled to occur, in full, in less than one year).

24. Each of the Purchase Agreements is governed by the laws of the State of New York.

25. In total, the Defendant disbursed at least $558,483.22 to the Debtor.

26. The Debtor, in turn, remitted at least $601,233.22 to the Defendant during a span of approximately one and a half years.

27. Upon information and belief, and—more specifically—based on a review of banking records, there likely exists at least one additional Purchase Agreement between the Debtor and the Defendant; such agreement is a subject of this litigation (just as are any other agreements between the parties), avoidance of all monies paid thereunder is herein sought, and the Debtor

looks forward to discovering additional information about said agreement(s) as this litigation progresses.

**Count I: Fraudulent Conveyance**
**(11 U.S.C. § 548)**

28. The Debtor repeats and realleges each and every foregoing paragraph, as though fully set forth herein.

29. The Debtor had financial liabilities that exceeded the Debtor's assets, from September 27, 2024 forward, and was thusly insolvent at the time of entering into each agreement with the Defendant.

30. The Debtor was without the ability to pay its debts, as they came due, at all times from September 27, 2024 forward.

31. Assuming, *arguendo*, the Purchase Agreements are *bona fide* sales agreements, the sale of future receivables was always made for markedly less than reasonably equivalent value.

32. If the Purchase Agreements are mischaracterized loans, each such Purchase Agreement is violative of both of the criminal *and* civil usury laws of the State of New York and thusly made for less than reasonably equivalent value.

33. Between September 27, 2024 and June 6, 2026, the Debtor paid the Defendant a sum of not less than $601,233.22 pursuant to the Purchase Agreements.

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) avoid all Purchase Agreements between the Debtor and the Defendant (including any Purchase Agreements not expressly enumerated herein but entered into during the application statutory limitations period), as well as all payments made thereunder, pursuant to the allowances of section 548(a)(1)(B) of title 11 of the United States Code; (ii) enter judgment in favor of the Debtor, and against the Defendant, pursuant to section 550 of title 11 of the United States Code, in a sum equal to all

monies paid to the Defendant pursuant to the Purchase Agreements; and (iii) afford such other and further relief as may be just and proper.

**Count II: Fraudulent Conveyance**
**(11 U.S.C. § 544; N.D. Cent. Code § 13-02.1-04)**

34. The Debtor repeats and realleges each and every foregoing paragraph, as though fully set forth herein.

35. Each Purchase Agreement caused the Debtor to have remaining assets that were unreasonably small in relation to the obligations incurred thereunder, with the cash furnished through each such agreement being insufficient to retire the obligations simultaneously incurred therewith.

36. The Debtor was without the ability to pay its debts, as they came due, at all times from September 27, 2024 forward.

37. Each Purchase Agreement denoted the incursion of a debt beyond the Debtor's ability to pay, with payments on each such Purchase Agreement necessarily coming at the expense of the timely retirement of the Debtor's other monetary obligations.

38. Assuming, *arguendo*, the Purchase Agreements are *bona fide* sales agreements, the sale of future receivables was always made for markedly less than reasonably equivalent value.

39. If the Purchase Agreements are mischaracterized loans, each such Purchase Agreement is violative of both of the criminal *and* civil usury laws of the State of New York and thusly made for less than reasonably equivalent value.

40. Between September 27, 2024 and June 6, 2026, the Debtor paid the Defendant a sum of not less than $601,233.22 pursuant to the Purchase Agreements.

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) avoid all Purchase Agreements between the Debtor and the Defendant (including any Purchase Agreements not

expressly enumerated herein but entered into during the application statutory limitations period), as well as all payments made thereunder, pursuant to the allowances of section 544 of title 11 of the United States Code; (ii) enter judgment in favor of the Debtor, and against the Defendant, pursuant to section 550 of title 11 of the United States Code, in a sum equal to all monies paid to the Defendant pursuant to the Purchase Agreements; and (iii) afford such other and further relief as may be just and proper.

**Count III: Fraudulent Conveyance**
**(11 U.S.C. § 544; N.D. Cent. Code § 13-02.1-05)**

41. The Debtor repeats and realleges each and every foregoing paragraph, as though fully set forth herein.

42. The Debtor had financial liabilities that exceeded the Debtor's assets, from September 27, 2024 forward, and was thusly insolvent at the time of entering into each agreement with the Defendant.

43. The Debtor was without the ability to pay its debts, as they came due, at all times from September 27, 2024 forward.

44. Assuming, *arguendo*, the Purchase Agreements are *bona fide* sales agreements, the sale of future receivables was always made for markedly less than reasonably equivalent value.

45. If the Purchase Agreements are mischaracterized loans, each such Purchase Agreement is violative of both of the criminal *and* civil usury laws of the State of New York and thusly made for less than reasonably equivalent value.

46. Between September 27, 2024 and June 6, 2026, the Debtor paid the Defendant a sum of not less than $601,233.22 pursuant to the Purchase Agreements.

47. The Debtor was justly indebted to, *inter alia*, Horizon Investments, LLC, pursuant to the terms of a $525,000.00 promissory note and related loan documents (including a subsequent forbearance agreement) from at least December 20, 2020 and at all times thereafter.

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) avoid all Purchase Agreements between the Debtor and the Defendant (including any Purchase Agreements not expressly enumerated herein but entered into during the application statutory limitations period), as well as all payments made thereunder, pursuant to the allowances of section 544 of title 11 of the United States Code; (ii) enter judgment in favor of the Debtor, and against the Defendant, pursuant to section 550 of title 11 of the United States Code, in a sum equal to all monies paid to the Defendant pursuant to the Purchase Agreements; and (iii) afford such other and further relief as may be just and proper.

**Count IV: Violation of Securities and Exchange Commission Rule 10b-5**

48. The Debtor repeats and realleges each and every foregoing paragraph, as though fully set forth herein.

49. Rocket drafted each of the Purchase Agreements.

50. Rocket presented each of the Purchase Agreements to the Debtor, for execution.

51. The Debtor did not edit any of the Purchase Agreements.

52. The Purchase Agreements each contain various material misrepresentations and omissions.

53. Specifically, the Purchase Agreements entered into on September 27, 2024 and May 30, 2025 both provide, *inter alia*, "RC and each Seller (together the 'Parties') intend and agree that the purchase and sale of the Future Receipts by Seller is not, nor interpreted to be, a loan," when the transactions occasioned by those Purchase Agreements are, in actuality, loans.

54. It was the intent of Rocket that the at-issue transactions be, materially, loans, with Rocket being in the business of lending monies and disguising such loans as future receivables purchases.

55. Specifically, despite being loans, neither of the Purchase Agreements set forth an interest rate and each thereby omits a material fact.

56. Rocket made these misrepresentations and omissions with scienter, as Rocket is motivated to deceive merchants (like the Debtor) and their principals.

57. Specifically, Rocket would not garner as much business if Rocket disclosed transactions to actually be loans, because presentation of the associated interest rates would cause potential counterparties to decline to enter into agreement on such conscious-shocking terms.

58. Specifically, the Debtor would not have agreed to borrow money at the rates of 61.92% and 78.01% per annum.

59. It is further evident Rocket made these misrepresentations and omissions with scienter insofar as the inclusion of these misrepresentations—and the exclusion of these omitted material terms—from Rocket's standardized agreement permits Rocket to conduct business in states with commercial usury limits, by allowing Rocket to feign to be a purchaser and not a lender.

60. The Debtor has suffered an economic loss on account of the Purchase Agreements by paying to Rocket monies of not less than $601,233.22.

61. A loan is a security within the definitional ambit of section 78c(a)(10) of title 15 of the United States Code.

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) enter judgment against Rocket, and in favor of the Debtor, in a sum equal to all monies paid to the Defendant

pursuant to the Purchase Agreements; and (ii) afford such other and further relief as may be just and proper.

**Count V: Claim Objection**
**(Fed. R. Bank. P. 3007(b))**

62. The Debtor repeats and realleges each and every foregoing paragraph, as though fully set forth herein.

63. Rocket has filed a proof of claim (the "Proof of Claim"), against the Debtor, for $224,750.00.

64. The Proof of Claim is premised upon one of the aforesaid Purchase Agreements.

65. The Purchase Agreement upon which the Proof of Claim is premised is violative of the criminal and civil usury laws of the State of New York and, ergo, unenforceable as against the Debtor.

66. The Purchase Agreement upon which the Proof of Claim is premised ". . . is both a metaphysical and legal impossibility. . . . A transfer of future rights to payment—that is, rights that as yet do not exist—cannot occur unless and until the rights to payment arise." *M Design Vill.*, *supra,* ¶ 17.

67. The Purchase Agreement upon which the Proof of Claim is founded is thusly "unenforceable against the [D]ebtor and property of the [D]ebtor." 11 U.S.C. § 502.

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) disallow the Proof of Claim, *en toto*; and (ii) afford such other and further relief as may be just and proper.

*[Signature on Following Page]*

Respectfully Submitted,

Dated: August 23, 2026 By: /s/ Maurice B. VerStandig

Maurice B. VerStandig, Esq.
The Dakota Bankruptcy Firm
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
Phone: (701) 394-3215
mac@dakotabankruptcy.com
*Counsel for the Debtor*