IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| In re:<br><br>JADE PRESENTS, LLC<br><br>Debtor. | ) | Case No. 26-30438<br>(Chapter 11) |
| In re:<br><br>TICKETS300, LLC<br><br>Debtor | ) | Case No. 26-30439<br>(Chapter 11)<br><br>(Jointly Administered) |

**SUBCHAPTER V PLAN OF REORGANIZATION**
**OF JADE PRESENTS, LLC AND TICKETS300, LLC**

Come now Jade Presents, LLC ("Jade") and Tickets300, LLC ("Tickets300") (collectively, the "Debtors" and each a "Debtor"), by and through undersigned counsel, pursuant to the rigors of Official Form 425A and section 1193 of title 11 of the United States Code, and provide the following plan of reorganization (the "Plan") herein:

**Background for Cases Filed Under Subchapter V**

**a. Description and History of the Debtors' Businesses**

The Debtors have been an integral part of the live entertainment scene, in the Upper Midwest, for years on end. Jade is an iconic regional promoter of concerts and live shows, with Tickets300 being a related entity formed for the titularly-self-evident purpose of handling ticket sales for events. It would seem few are the members of the Fargo community who do not have at least some passing knowledge of Jade's presence in the marketplace and numerous are the members of the Fargo community who have enjoyed at least one evening of entertainment orchestrated by Jade, Tickets300, and their now-former loyal staffs.

Jade was formally established as a North Dakota limited liability company on January 11, 2007. Tickets300 followed two and a half years later, on September 14, 2009. Both remained active and vibrant commercial entities until just before these bankruptcy cases were filed, with operations being partially suspended—and hard working employees being separated—on the eve of petitions for relief being docketed on June 6, 2026.

While a number of factors jointly worked to precipitate these filings, the Debtors' dealings with merchant cash advance ("MCA") entities stand out as amongst the most toxic of contributing elements. What started as a modest effort to procure working capital became a vicious cycle of entering into one MCA agreement after another, each with ambitions of freeing up enough cash to survive. The MCAs, meanwhile, cannibalized the Debtors' revenues and bank accounts,

commanding obscene—and largely-undisclosed—*de facto* interest rates often exceeding ten times those imprinted on the pages of the Wall Street Journal.

These cases were thusly filed in early June 2026, with an open acknowledgement Jade and Tickets300 would be using chapter 11 to efficiently wind down their operations and liquidate in accord with the provisions of title 11 of the United States Code (the "Bankruptcy Code"). What follows are the terms upon which they propose to carry out that liquidation.

**b. Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. The Debtors entered bankruptcy with $393,460.10 in assets (all belonging to Jade). Based on a review of the Debtors' schedules and respective claims registers, the Debtors appear to have not more than $4,490,821.64 in liabilities, of which at least $671,243.76 are disputed, $260,587.31 are owed to insiders, and $479,389.51 were contingent as of this case's filing. While it is possible additional claims will be filed by governmental entities, neither Debtor reasonably anticipates such occurring. The deadline for other parties to file claims has lapsed.

Through this Plan, the Debtors believe they will be able to pay between $1,000,000.00 and $1,500,000.00 to creditors, of which not more than $153,556.89 will be paid to secured creditors, not more than $312,583.26 will be paid to pre-petition priority creditors, and the rest will be paid to unsecured creditors *after* paying the expenses of estate administration.

The disbursement range in the foregoing paragraph is speculative and is largely based on a projected recovery in various lawsuits. This is not a scientific number or range of numbers. The Debtors could recover significantly less money, slightly less money, more money, or money within that range. The Debtors hope that they will ultimately be able to distribute approximately 10 cents on the dollar to unsecured creditors but, again, this is a guess and a particularly speculative guess at that. Creditors should *not* rely on the validity of these predictions when considering this Plan.

If these cases were converted to chapter 7 and liquidated, the Debtors believe the following funds would be available for disbursement:

| Asset | Scheduled Value | Liquidation Discount | Liquidation Value |
|---|---|---|---|
| Office Furniture | $2,817.00 | 50.00% | $1,408.50 |
| Office Equipment | $13,327.00 | 50.00% | $6,663.50 |
| Machinery, Equipment and Vehicles | $105,126.00 | 50.00% | $52,563.00 |
| Artist Village | $60,000.00 | 80.00% | $12,000.00 |
| Litigation Claims Against MCAs | n/a | n/a | $1,000,000.00 |
| Net | | | $1,072,635.00 |
| Less: Trustee's Commission | | | ($56,383.91) |
| Total Chapter 7 Disbursement | | | $1,016,251.09 |

The Debtors urge a greater sum will be available for disbursement under this Plan because no trustee's compensation will be paid to a chapter 7 trustee. Under either eventuality, professionals (i.e., attorneys) will earn fees for case work. And under either eventuality, monies will go to creditors. But by liquidating through chapter 11, a chapter 7 trustee's commission can be avoided *and* the expenses of transitioning the case to chapter 7 (which would cause professional fees to be increased) will also be avoided.

**c. Ability to Make Future Plan Payments and Operate Without Further Reorganization**

The Debtors must also show that they will have enough cash over the life of the Plan to make the required Plan payments. This is a liquidating plan where all monies will be disbursed to creditors and where no funds are being promised in precise sums.

Solely for purposes of section 1190(1)(C) of the Bankruptcy Code, and in an expressly non-binding fashion, the Debtors project an ability to make a singular payment, of $1,072,635.00, to be split amongst creditor classes in accord with the priority scheme established in the Bankruptcy Code and under this Plan, on or before July 1, 2028. Creditor payments may be made sooner, or in greater frequency (i.e., more than once), should circumstances so allow. The total sum is also likely to vary from that projected. But, for purposes of a projection, and erring on the side of conservatism, the Debtors' anticipate a singular disbursement being made at a time sufficiently removed from the Effective Date as to allow for the reduction to judgment of all litigation rights.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

**Article 1. Summary**

This Plan proposes to pay creditors of the Debtors from the liquidation of the Debtors.

The Plan provides for: 1 class consisting of a secured claim

4 classes of unsecured claims; and

1 class consisting of an equity holders.

The Plan also provides for the payment of administrative priority claims other than those placed in classes.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

**Article 2. Classification of Claims and Interests**

| | | |
|---|---|---|
| **Section 2.01** | **Class 1** | The secured claim of the United States Small Business Administration. |
| **Section 2.02** | **Class 2** | The priority claims of former employees of the Debtors, correlative to unpaid wages. This class does *not* include the unsecured claims of the same individuals for monies loaned |

| | | |
|---|---|---|
| | | (which are subsumed in class 3), nor does this class include the priority claims of taxing authorities (which are not placed in a class and which are, instead, addressed in section 3.01 below). |
| **Section 2.03** | **Class 3** | General unsecured creditors not otherwise classified (including all consumer claims correlative to event tickets) |
| **Section 2.04** | **Class 4** | Claims of insiders (all of which are unsecured) |
| **Section 2.05** | **Class 5** | Claims filed after the expiration of the claims bar date |
| **Section 2.06** | **Class 6** | The Debtor's equity interests. |

*For ease of reference, a table listing all claimants and the class(es) into which they are placed is attached hereto as Exhibit A. Consumer claimants are not separately listed on this table but, instead, are grouped simply as "Consumers." As noted above, all consumer claimants have been placed in class 3.*

**Article 3. Treatment of Administrative Expense Claims and Court Costs**

| | | |
|---|---|---|
| **Section 3.01** | **Unclassified Claims** | Under § 1123(a)(1) of the Bankruptcy Code, certain administrative expense claims are not in classes. |
| **Section 3.02** | **Administrative Expense Claims** | Pursuant to Section 1191(e) of the Bankruptcy Code, holders of allowed administrative claims will be paid (i) first, out of retainers they are holding at the time their respective fees are approved by this Honorable Court; and (ii) second, out of the proceeds of litigation provided for herein, with all such payments to be made during the life of this Plan. The subchapter V trustee may be paid out of a retainer held by the Debtors' reorganization counsel, up to $10,000.00. |
| **Section 3.03** | **Priority Tax Claims** | Each holder of a priority tax claim will be paid in full not later than June 5, 2031. |
| **Section 3.04** | **Statutory Fees** | There are no statutory fees due in this case. |
| **Section 3.05** | **Prospective Quarterly Fees** | There are no prospective quarterly fees that will be due in this case. |

**Article 4. Treatment of Claims and Interest Under the Plan**

| **Class** | **Impairment** | **Treatment** |
|---|---|---|
| Class 1 – Small Business Administration | Impaired | Class 1 consists of the secured claim of the United States Small Business Administration. This claim is only secured to the extent of the value of the Debtors' pre-petition property. Since the litigation being pursued by the Debtors predominately arises under chapter 5 of the Bankruptcy Code, such is not subject to the lien of this class. The proceeds of the sale of the Debtors' physical assets will be used to pay the claim of this class, *provided, however*, that the lesser of (i) 10% of any sale proceeds, or (ii) $10,000.00 of such sale proceeds, shall be paid not to this class but, rather, shall be applied toward the retirement of the costs of administration of the Debtors' estates and this Plan, pursuant to the allowances of section 506(c) of the Bankruptcy Code.<br><br>Any portion of the claim of class 1 not paid by the liquidation of the Debtor's pre-petition property shall be included in class 3. Until such a time as a liquidation of the Debtor's pre-petition property is completed, any disbursements to class 3 shall be made as though the class 1 claimant holds a class 3 claim in the amount of $53,556.89. Once the liquidation of the Debtor's pre-petition property is completed, any overpayment or underpayment to the class 1 creditor, on account of a class 3 claim, will be reconciled. |
| Class 2 – Employee Wage Claims | Impaired | Class 2 consists of the wage claims of former employees of the Debtors. |

| | | |
|---|---|---|
| | | These claims will be paid from proceeds of the Debtors' litigation rights, *pari passu* with unclassified tax claims (state and federal), *after* the payment of the administrative expense claims of the Debtors' estates and this Plan, but *before* the payment of the claims of any other class. |
| Class 3 – General Unsecured Creditors | Impaired | Class 3 consists of general unsecured creditors whose claims are not otherwise classified. This class shall be paid from the proceeds of the Debtors' litigation rights, *after* the payment—in full—of the claims of (i) administrative expense claim creditors; (ii) tax claimants (state and federal); and (iii) class 2 creditors. |
| Class 4 – Insiders | Impaired | Class 4 consists of the claims of insiders. It is not reasonably believed there will exist monies to pay this class. However, if the claims of class 3 were to be paid in full, monies would then next be disbursed to class 4. |
| Class 5 – Late-Filed Claims | Impaired | Class 5 consists of claims filed after the claims bar date. It is not reasonably believed there will exist monies to pay this class. However, if the claims of class 3 and class 4 were to be paid in full, monies would then next be disbursed to class 5. |
| Class 6 – Equity | Impaired | Upon liquidation of the assets, as provided for herein, the Debtor shall be deemed liquidated and formally wound up, without the need for any further dissolution proceedings. Equity shall take nothing under this Plan except as provided for in section 7.04 hereof. |

## Article 5. Allowance and Disallowance of Claims

**Section 5.01 Disputed Claim.** A *disputed claim* is a claim that has not been allowed or disallowed and as to which: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated; or (iii) such claim is marked as disputed on Exhibit A hereto.

**Section 5.02 Delay of Distribution of Disputed Claims.** No distribution will be made on account of a disputed claim unless such claim is allowed by a final, non-appealable order, but funds equal to those that would otherwise be distributed to such claimholder(s) shall be held back, and left undistributed, until such a time as the allowance or disallowance of such claim is determined by a final, non-appealable order.

**Section 5.03 Settlement of Disputed Claims.** The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**Section 5.04 Time to Dispute Claims**. The Debtor anticipates objecting to at least one claim in this case. Any such claim objection must be filed by the Debtor within one year from the effective date of this Plan (as defined in Section 8.02 hereof), *except* any objection to the claim of any governmental tax creditor may be filed at any time within one year of the date on which such claim is filed. Any claim marked as disputed on Exhibit A, but to which an objection is not filed by the deadline established herein, shall then cease to be disputed.

## Article 6. Provisions for Executory Contracts and Unexpired Leases

**Section 6.01 Assumption.** The Debtors do not assume any contracts whatsoever.

**Section 6.02 Cure Payments.** Insofar as the Debtors do not herein assume any contracts, no cure payments are due to any contractual counterparties.

**Section 6.03 Rejection.** The Debtors reject all executory contracts and unexpired leases to which either or both of them are parties.

## Article 7. Means for Implementation of the Plan

**Section 7.01 Substantive Consolidation**

Pursuant to section 1123(a)(5)(C), on the Effective Date, the two Debtors shall be deemed substantively consolidated and merged for all purposes. The assets of each Debtor shall become the assets of both Debtors and the liabilities of each Debtor shall, too, become the liabilities of both Debtors. The Debtors shall, from the Effective Date forward, be known as Jade Presents, LLC (subject to that entity being liquidated pursuant to the provisions of this Plan) and trade solely in the name of that entity. Tickets300, LLC shall be deemed merged into Jade Presents, LLC for all lawful purposes on the Effective Date.

This substantive consolidation is warranted by several realities. First, and most notably, over 350 consumers have filed claims in these cases, through an innovative system designed by this Honorable Court.[1] Yet it appears every one of those consumer claims is likely against Tickets300 (the entity in contractual privity with consumers purchasing event tickets), while almost all of the Debtors' assets—including litigation rights—are likely held by Jade. Equity abhors an outcome where consumers are left without any payment on their claims. In this case, such would be a manifest injustice.

Second, the financial dealings of Jade and Tickets300 were so interwoven as to make the proverbial unscrambling of the egg nearly impossible. The entities used the funds of one another for myriad purposes, shared staff, and generally operated as a singular going concern. Very often the two Debtors vouched for the obligations of one another and, when they did not, such was most frequently simply because a given creditor did not make the request.

Third, the aforementioned comingling of monies creates a prism whereby the two Debtors would likely be compelled to explore pursuing claims against each other, as part of their respective reorganizations, if not substantively consolidated. Yet doing so would promote scant interests aside from the payment of legal fees, with it being reasonably expected the costs of such litigation—including forensic analysis of books and records—would dramatically exceed any monetary recovery in favor of a putatively "prevailing" party.

Fourth, too many claims overlap between the two Debtors' estates, with the estates being jointly and severally liable to specific creditors, to permit a simultaneous liquidation or reorganization without constantly reconciling claim sizes to account for diminutions of sums owed by virtue of each estate making distributions. Or, stated otherwise, a large number of claims would be paid by both estates in any event, and administrative convenience favors dispensing with the awkward accounting such would command to ensure no creditor be twice paid on the same debt or disproportionately benefit from being a creditor of both estates.

**Section 7.02 Appointment of Estate Representative**

Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, an estate representative (the "Estate Representative") shall take charge of all of the Debtors' litigation rights (including both asserted and unasserted claims), on the Effective Date, and work to efficiently liquidate such rights

---

[1] A footnote does not do justice to the gratitude owed to this Honorable Court and its staff for creating a dynamic system through which members of the public can file proofs of claim on the court's own website, without compelling the Debtors to expend monies on a claims agent and without forcing consumers to navigate the laborious task of mailing and printing claim forms. When these cases are completed, the manner in which claims were handled should be further discussed, modeled, and promoted as widely as possible. The Debtors and their counsel are enormously grateful for the work—and open-mindedness—of this Honorable Court in developing the claims process in these cases. It is not hyperbole to posit that every other bankruptcy court in America would do well to take note of how consumer claims were managed in these cases.

through the pursuit and—where reasonable in the business judgment of the Estate Representative, subject to this Honorable Court's approval under Rule 9019—settlement of such claims.

The Estate Representative shall be compensated for her/his services at the ordinary rate charged by the Estate Representative, as a professional, to other clients of the Estate Representative.

The Estate Representative may resign at any time, for any reason or no reason at all, by tendering notice to the Bankruptcy Court. The services of the Estate Representative shall be deemed to automatically terminate upon the occurrence of (i) the Estate Representative's death; (ii) the Estate Representative's mental incapacity, as certified by at least one board certified physician in the community in which the Estate Representative receives medical treatment; (iii) the bringing of criminal charges against the Estate Representative, punishable by imprisonment, except for those correlative to an offense solely related to the speed of operation of a motor vehicle, in any federal, state, or tribal court; (iv) the Estate Representative being suspended or barred from her or his professional practice, by any licensing body, except for where such suspension or bar is a result of (A) a voluntary decision to assume "inactive" (or comparable) status; (B) a failure to timely pay dues; or (C) a failure to timely complete professional education courses; (v) the Estate Representative ceasing to be a person who may lawfully perform work in the United States; and/or (vi) the Estate Representative being declared *persona non grata* by the United States or any constituent state or territorial possession thereof. The Estate Representative may otherwise only be removed by order of the Bankruptcy Court (or any court enjoying appellate jurisdiction over the Bankruptcy Court or hearing one or both of these cases by virtue of a withdrawal of a reference to the Bankruptcy Court), for good cause shown.

The initial Estate Representative shall be Erik Ahlgren, of Fergus Falls, Minnesota, should he accept said appointment. Should Mr. Ahlgren decline to accept said appointment by the Effective Date (with acceptance being denoted by filing a notice on the docket of the Jade bankruptcy case), or should he thereafter resign or have his services terminated, the successor Estate Representatives—in order of service—shall be (i) Michael Schmitz, of Bismarck, North Dakota; (ii) Lauren Berret, of Philadelphia, Pennsylvania; and (iii) Andrea Campbell Davison, of Arlington, Virginia. Should each of the foregoing individuals decline to serve, resign, and/or have their services terminated, the Debtor's equity interest shall promptly move the Bankruptcy Court for appointment of another individual to serve as Estate Representative, and the Bankruptcy Court shall confirm the appointment of such successor so long as she or he appears appropriately qualified in the sole and absolute discretion of the Bankruptcy Court.

**Section 7.03 Litigation**

Jade has commenced three lawsuits against MCA entities, in an effort to recover monies paid to those entities prior to the filing of these bankruptcy cases. Jade has also taken steps to seek discovery in connection with two other MCA entities, with Jade believing it is likely—albeit not certain—similar lawsuits will then be brought against those two other entities.

In total, Jade paid at least $1.9 million to MCA entities in the two years before seeking bankruptcy relief. Jade is arguing those payments can be unwound as fraudulent conveyances

under both the Bankruptcy Code and state law. Jade is also arguing those payments were made pursuant to agreements that violate at least one provision of federal securities laws.

Parties in interest are warned that litigation against MCA entities is an emerging and rapidly-developing area of law. There is very little precedent surrounding such suits in North Dakota. The Debtors are optimistic significant money can be recovered, but such optimism is absolutely not a guarantee. And even if a judgment is realized against one or more MCA entities, the solvency of those entities is, itself, not assured; numerous MCA entities have failed over the past year.

Being cognizant of the foregoing uncertainty: The Estate Representative will helm the existing lawsuits, as well as any additional suits that may be brought against MCA entities or other persons/entities. The Estate Representative will be permitted to investigate any matters or persons necessary to carry out the duties provided for herein, including through use of Rule 2004. The Estate Representative shall be permitted to investigate any allegations concerning the relationship between the Debtors and their equity holder. Should the Estate Representative, in her or his sole and absolute discretion, believe there to exist good cause to bring suit against the Debtors' equity holder, the Estate Representative may do so.

The Estate Representative shall be represented by the Debtors' general reorganization counsel, *except* the Debtors' general reorganization counsel shall not pursue any claims against the Debtors' equity interest and separate counsel shall be engaged by the Estate Representative for such purposes should the Estate Representative believe claims against the Debtor's equity interests to be properly pursued.

**Section 7.04 Tangible Asset Liquidation**

The Debtors—through their equity interest and not through the Estate Representative—will work to sell all tangible assets, free and clear of all liens and encumbrances, at the highest and best value obtainable on the open market, for a period of not more than six month from the Effective Date. Any such sale shall be subject to notice to the 20 largest unsecured creditors, the class 1 claimant, and all parties receiving electronic notice in these cases (including the United States Trustee), with a fourteen-day objection period following such notice.

Should no objection be filed during the objection period, the Debtor may consummate the proposed sale. Should an objection be filed, such objection shall be adjudicated before a sale is carried out. The Bankruptcy Court shall hear any objections and shall assess the validity and propriety of any proposed sale as though such were a sale proposed under section 363 of the Bankruptcy Code, *except* there shall exist an irrebuttable presumption—by virtue of this Plan being confirmed—that each proposed sale complies with section 363(f) of the Bankruptcy Code.

Any tangible assets not sold within six months of the Effective Date shall be auctioned on the seven month anniversary of the Effective Date (or, should such be a holiday or weekend, on the following business day). The auction shall be carried out on the front steps of the Bankruptcy Court, in Fargo, North Dakota, and shall be called by counsel for the Debtors. Notice of the auction shall be placed on the docket in the Jade bankruptcy case, at least 20 days prior to the auction. At least one advertisement for the auction shall also be placed in the Fargo Forum, at least 10 days

prior to the auction. The auction shall be for a single lot consisting of all remaining tangible assets of the Debtors' estates (which, for the avoidance of ambiguity, shall *not* include litigation rights, cash, or cash equivalents), with a starting bid of $10.00. Should no bids be made at the auction, the tangible assets shall be deemed forfeited by the Debtors and shall inure to the benefit of the Debtors' equity interests.

Closing shall occur at 10:00 am central time, one business day after the cessation of the auction, at the offices of the Debtors' reorganization counsel in Fargo, North Dakota. At closing, the high bidder shall be presented a bill of sale, executed by the Debtors' reorganization counsel as an officer of the Debtors' estates, and the high bidder shall present certified funds (or, if less than $1,000.00, cash may be permitted if photographed when tendered). A report of sale shall be promptly thereafter docketed in the Jade bankruptcy case.

All tangible assets of the Debtors, regardless of how sold, shall be sold as-is and where-is. No representations or warranties shall be made nor shall be implicit. *Caveat emptor.*

**Article 8. General Provisions**

**Section 8.01 Definitions and Rules of Construction.** The definitions and rules of construction set forth in §§ 101-02 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan.

**Section 8.02 Effective Date.** The effective date of this Plan is the first business day following the date that is 14 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated.

**Section 8.03 Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 8.04 Binding Effect.** The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of, the successors, assigns and/or receiver(s) of such entity.

**Section 8.05 Default.** Should there occur a default under this Plan, creditors will have all rights provided for in the Bankruptcy Code (including section 1112 thereof, inclusive of its allowances for the bringing of a motion to convert this proceeding to one under chapter 7 of the Bankruptcy Code) as well as the right to seek recourse for breach of contract together with such remedies as this Honorable Court may deem just and proper, sitting as a court of equity; such rights will also vest in any interested parties with Article III standing to pursue such rights. A default hereunder shall be deemed to occur if the Debtor fails to make any payment provided for by this Plan, in the full amount so provided, and does not cure such failure within thirty (30) days of being given written notice of said failure by a party in interest. A default shall also be deemed to occur if the Debtor materially violates any substantive provision of this Plan.

**Section 8.06 Disbursing Agent.** The subchapter V trustee shall act as disbursing agent for the life of this Plan.

**Section 8.07 Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**Section 8.08 Controlling Effect.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of North Dakota govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**Section 8.09 Escheat.** If any distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder. Unclaimed property shall be (i) first paid to other members of the class of the claimant not claiming said distribution, until such a time as said class is paid in full; (ii) second paid to each junior class, until all classes are paid in full; and (iii) then, if and when each class is paid in full, remaining funds shall be donated to the University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond, Esq. in the charitable manner she sees most fit. The University of Miami School of Law Bankruptcy Clinic works with members of the South Florida legal community to provide *pro bono* services to persons in need of bankruptcy relief, while also furnishing law students with valuable pedagogical experience in the field of bankruptcy law.

**Section 8.10 Retention of Jurisdiction.** The United States Bankruptcy Court for the District of North Dakota shall retain jurisdiction of this chapter 11 case to issue orders necessary to the consummation of the Plan; to determine the allowance of compensation and expenses of professionals; to determine any and all adversary proceedings, applications and contested matters; to determine issues or disputes relating to the assumption of executory contracts and any claims related thereto; to determine disputes as to classification or allowance of claims or interests; to issue such orders in aid of execution of this Plan to the extent authorized by § 1142 of the Bankruptcy Code; to enforce the provisions of the Plan; to recover all assets of the Debtors and property of the Debtors' estates, wherever located; to resolve any dispute between or among any of the parties to this bankruptcy proceeding, to determine other such matters as may be set forth in a confirmation order or as may be authorized under the provisions of the Bankruptcy Code; to enter a final decree closing the bankruptcy case; and to correct any defect, cure any omission or reconcile any inconsistency in this Plan or confirmation order, and to take any action or make any ruling as may be necessary to carry out the purpose and intent of this Plan.

**Section 8.11 Modifications.** Modification of this Plan shall be governed by section 1193 of the Bankruptcy Code.

**Section 8.12 Professional Fees.** Per section 3.02 of this Plan, the Debtors must seek the approval of this Honorable Court prior to paying any professional fees incurred during the pendency of this case. Commencing on the Effective Date, however, *all* professional fees shall be subject to a streamlined payment mechanism whereby the subject professional (whether the subchapter V trustee, counsel, the Estate Representative, or anyone else within the ambit of section 327(a) of the Bankruptcy Code) shall file with the Bankruptcy Court a notice of their fees, attaching an invoice for such fees. If no party in interest then objects to the payment of such fees, within 10 business days, the subchapter V trustee—as disbursing agent—shall pay such fees (provided the estate have funds sufficient to make such payment; if not, payment shall be delayed until such a time as

economically prudent, but no later). If an objection is filed, such shall be adjudicated by the Bankruptcy Court before the correlative fees are paid.

**Article 9. Discharge**

**Section 9.01 Discharge.** The Court shall grant the Debtor a discharge pursuant to 11 U.S.C. § 1192 of all debts that arose prior to the Petition Date in this case, except any debt (1) on which the last payment is due after the first five (5) years of the Plan; and (2) debts of the kind specified in Section 523(a) of the Bankruptcy Code.

(a) If the Plan is confirmed under 11 U.S.C. § 1191 as a consensual plan, the Debtor shall receive a discharge on the effective date of the Plan; or

(b) If the Plan is confirmed under 11 U.S.C. § 1191(b), the Bankruptcy Court shall grant a discharge upon the completion of the plan payments being made.

**Section 9.02 Effect of Discharge.** This discharge will be effective against all creditors of the Debtor given notice of this bankruptcy case and sent a copy of this Plan, together with their respective members, managers, insiders, shareholders, officers, directors, trustees and receivers.

**Article 10. Retention of Certain Assets; Notice of Substantial Consummation**

**Section 10.01** Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, all litigation claims (including, but not limited to, rights arising under Chapter 5 of the Bankruptcy Code) shall remain an asset of the Debtor's bankruptcy estate—and shall, accordingly, remain subject to the protections of section 362(c)(1) of the Bankruptcy Code—to and through January 1, 2035, at which time said interest (should any remain) shall revest in the Debtor.

**Section 10.02** Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, all tangible assets, cash, and cash equivalents shall remain an asset of the Debtor's bankruptcy estate—and shall, accordingly, remain subject to the protections of section 362(c)(1) of the Bankruptcy Code—to and through January 1, 2035, at which time said interest (should any remain) shall revest in the Debtor.

**Section 10.03** If the Plan is confirmed under 11 U.S.C. § 1191(a), the Debtor will file a Notice of Substantial Consummation not later than 14 days after the Plan is substantially consummated per 11 U.S.C. § 1183(c)(2).

*[Signature on Following Page]*

Respectfully Submitted,

/s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
THE DAKOTA BANKRUPTCY FIRM
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
mac@dakotabankruptcy.com
*Counsel for the Debtor*